THE BOARD OF TRUSTEES OF THE ILLINOIS AND MICHIGAN CANAL, Appellants, v. THE CHICAGO AND ROCK ISLAND RAILROAD COMPANY, Appellees.

APPEAL FROM COOK COUNTY COURT OF COMMON PLEAS.

The grant of a charter by the legislature, which authorizes a condemnation of the right of way over the lands held by the canal trustees, does not violate the grant made by the State to those trustees.

All grants made by the State, whether to the canal trustees or others, although irrevocable, are subject to the right of eminent domain, unless that right is expressly relinquished.

The charter to the Rock Island Railroad Company does not prohibit that company from constructing their road within ninety feet of either side of the canal.

The effect likely to be produced by the opening of the railroad, in diminishing the revenues of the canal, does not violate the contract between the State and the trustees of the canal.

THE prayer of the bill filed by the Canal Trustees against the Chicago and Rock Island Railroad Company was, that the said company, their contractors, agents, &c., should be enjoined and commanded to desist from any further prosecution of said road from Chicago to La Salle; from going upon, interfering with, and digging up, any portion of the canal lands, especially any part of the canal interest, canal banks, tow-paths, heel-paths, or any part or parcel thereof, and from operating said railroad.

At February term, 1852, of the Cook County Court of Common Pleas, MARK SKINNER, Judge, presiding, the bill was dismissed. The Canal Trustees thereupon prayed for and obtained this appeal.

J. N. ARNOLD, for appellants.

N. B. JUDD and J. H. COLLINS, for appellees.

CATON, J. The question presented by this record is one of magnitude; and previous to the decision of the case of the Charles River Bridge v. The Warren Bridge, 11 Pet. 420, by the Supreme Court of the United States, might have been considered as presenting some difficulties in its determination. That decision, although by a divided court, and dissented from by judges of no less eminence than Story and Thompson, has been since strictly adhered to by that court, and has received the approval of all the State tribunals wherever the question has been presented;

and the practical results of the doctrine there laid down have been so just, salutary, and beneficial, as to command the commendation of lawyers and statesmen.   That case decides, that the authority to construct a public thoroughfare, and the exclusive right to levy and collect tolls for passing over it, conferred no exclusive right in the line of travel which it was designed to accommodate ; and that the legislature might authorize the construction of a rival thoroughfare for the accommodation of the same line of travel, although the effect might be not only to diminish the revenues, but absolutely to destroy the value of the first ; and that, too, where a large bonus was paid for the right to construct it and to collect the tolls.   Indeed, the principles of this decision have repeatedly received the express sanction of this court; and its propriety, and even necessity, was expressly admitted by the complainants' counsel upon the argument of this cause, and an attempt was made to evade its force by an effort to draw a distinction between that case and the one at bar.

To establish such distinction it is necessary to show, that it was the intention of the legislature, in the contract which was made between the State and the bondholders who became parties to the contract, to secure to the canal trustees not only an exclusive right to collect tolls for the use of the canal, but also that they should have the exclusive right to do all the carrying business, which would naturally flow through the canal in the condition of the other thoroughfares of the country, as it then was.   It must appear that the legislature designed to divest itself of the right to provide for any other means of communication to accommodate the transit of passengers and produce, which otherwise would seek the canal.   That it designed to shut out all other means of communication ; to exclude all other improvements which might interfere with the revenues of the canal.   No matter what improvements might be made in the means of transit; no matter what progress science and experience might make in devising a cheaper and more speedy means of communication, it was predetermined that such improvements should never invade the precincts of this canal.   In this vicinity progress should stop.   Here improvement should be excluded.   No matter what the public good might require ; no matter what the exigencies of the State might demand, the hands of the legislature and the people were tied up, and nothing could be done to expedite the business, which, for the want of additional facilities, would seek accommodation through this canal.   Was such the design of the legislature ?   Was this in the contemplation of any of the parties to the contract ?   Are

the energies of the people thus fettered down ? If such was the
intention of the legislature ; if such was the design of the con-
tracting parties ; if such are the provisions of the contract, then
they must be enforced; for this court will be the last of all
to sanction the violation of any of its provisions, no matter
what consequences may follow from the enforcement of the con-
tract.

That this arrangement between the State and the bondholders,
represented by the present complainants, was a contract, there
can be no doubt; and so was the charter of the Charles River
Bridge; and that case was decided upon that ground. The
terms of this contract are to be found in the canal laws of 1843
and 1845, which were accepted by the bondholders, who were
subscribers to the fund of sixteen hundred thousand dollars,
authorized by those laws to be subscribed for the completion of
the canal. By those laws the canal trustees were created a
body corporate. They constitute the charter under which they
have a legal being. The first two sections of the act of 1843,
authorizes a loan of sixteen hundred thousand dollars, for the
purpose of completing the canal, " solely on the credit and
pledge of the said canal, its tolls, revenues, and lands," and
describe the persons who may subscribe to the loan. The third
and fourth succeeding sections provide for the appointment of
three trustees, to be known as the " Board of Trustees of the
Illinois and Michigan Canal." The eighth section provides,
that the board of trustees, so far as is consistent with that act,
should possess all the powers, and perform all the duties, con-
ferred upon the canal commissioners by the act of 1836, and
the acts amendatory thereto. The ninth section provides for
filing with the governor, the evidences of indebtedness against
the State held by the subscribers to the loan. The tenth sec-
tion irrevocably grants to the board of trustees, the canal, canal
lands, &c., for the purpose of securing the subscribers to the
loan. The eleventh and twelfth sections provide for the pay-
ments of the loan by the subscribers to the trustees. The thir-
teenth and fourteenth sections authorize the trustees to take
possession of the canal, and canal property, and to go on and
complete the work, and to sell the canal lands, and to report to
the governor. The fifteenth section provides as follows : " The
said board of trustees shall annually establish a tariff of tolls, to
be paid for transportation upon said canal (but the legislature
hereby reserves the right to increase the tolls, with a view to
increase the revenue, but shall not reduce the same without the
consent of the trustees) ; and are hereby fully authorized and
empowered to collect the same." And this section further

authorizes the trustees to make rules and by-laws, regulating the collection of tolls, and the police of the canal. The sixteenth section provides for the mode in which the trustees shall distribute among the subscribers to the loan, and bondholders, the funds which should come to their hands after the completion of the canal and payment of current expenses. The seventeenth section provides for the settlement with former contractors; and the following section states when the act should go into effect; and the nineteenth section states when the trust shall cease, and the property revert to the State. The twentieth section declares, that the act shall be a public act, and shall be liberally construed; and the State pledges herself to supply, by future legislation, such defects as may be found necessary to enable the trustees to carry into full effect the fair and obvious intent of the act. The two remaining sections authorize the governor to negotiate with the bondholders upon the general principles of the act, in case any of its provisions should be found objectionable, and provide for the appointment of a chief engineer by the trustees.

In order to meet the views of the bondholders, a supplemental law was passed in 1845, providing that the governor should execute to the trustees a conveyance of the property which, by the tenth section of the law of 1843, was granted to them, changing, in some respects, the order of payment to be made by the trustees; and providing, that a majority of the trustees should have power to act and decide in all cases, and that their acts should bind all parties; and changing, in some respects, the mode of the appointment of the trustees. There are some other provisions of this supplemental act, which it is unnecessary to mention. Under the provisions of these laws, the loan was subscribed, the trustees appointed, the conveyance made, the town paid by the subscribers, and the canal completed, and was at the time of the passage of the railroad charter, and still is, in the possession and control of the trustees.

There are two provisions of this contract between the State and the subscribers to the loan, who are now legally represented by the present complainants, which, it is insisted, have been violated by the passage of the railroad charter. The first is the grant of the canal lands to the trustees; and the second is that which authorizes the trustees to levy and collect tolls for transportation upon the canal, which may be increased, but shall not be reduced, by the legislature, without the consent of the trustees.

In the consideration of this case, I lay out of view that portion of the railroad charter which authorizes a compromise

27*

Illinois and Michigan Canal *v.* Chicago and Rock Island Railroad Co.

between the defendants and the canal trustees, for the right of way through the canal lands, because the trustees have not accepted its terms and granted the right of way. That leaves the case precisely as if no such provision had been contained in the charter; for the State certainly had no more right to coerce the trustees to grant the right of way to the railroad, upon any arbitrary terms which she might prescribe, ·than she had to make a similar provision for the right of way over the lands held in fee by an individual. The legislature had the right to impose terms upon the railroad company in granting the charter, and compel them to pay tolls to the canal trustees; but they could not compel the trustees to accept those tolls, either as an equivalent for the right of way or for any other consideration. Terms were imposed upon the defendants, but were not accepted by the complainants; and hence that portion of the charter has ceased to be operative, and may be laid out of consideration. It was not for the legislature to say that the terms were just to the trustees, nor for us to inquire whether they should have been accepted.

The defendants proceeded under their charter, and obtained the right of way, by condemnation, over the lands of the complainants, the same as if owned by individuals; and it is insisted, that if the charter authorized this to be done, it was a violation of the grant of the lands made by the State to the trustees. This, we conceive, is not the case. It is true, the State could authorize the railroad company to do nothing which she could not do herself. If the State, in making the conveyance of these lands, relinquishes the right of eminent domain over them, then, indeed, she could not confer the right of condemnation upon the defendants. But this she did not, and never intended to do. It is true she irrevocably granted the lands to the trustees; and so were all her grants of lands irrevocable. The word irrevocable, in the law, added nothing to its force and effect. Without that word, the grant would have been irrevocable. This grant was no more irrevocable than other grants of canal lands which she had previously made to individuals. The fee-simple passed to the trustees, and nothing more. They were authorized to sell the lands; and if the trustees could resist the exercise of the right of eminent domain over the lands, then their grantees could do the same, for they could transfer the lands as absolutely and unincumbered as they possessed them. The title conveyed to the trustees was the same, and nothing more than the title ordinarily conveyed by a sovereignty to the public domain, with the single exception, that the State relinquished the right to tax them till they should

have been sold and paid for under the law. In all other respects she retained over them the same right of sovereignty as over all other lands within her limits. The exercise of this sovereign power is not a revocation of the grant which she had made of the lands. All grants made by the State, although irrevocable, are subject to this right of eminent domain, unless it is expressly relinquished, as in case of the right of taxation.

Again, it is insisted, that the defendants have violated their charter, by interfering with the navigation of the canal, which they are prohibited to do by their charter. This allegation of the bill is denied by the answer, which shows that the road is nowhere located within the limits or prism of the canal, although the road does in some instances run across the waters of the canal, which set back upon the low grounds adjoining it, on the side opposite the tow-path. This is not an interference with the navigation of the canal. That is left open and unobstructed, for the free passage of boats. Nor are the defendants prohibited from constructing their road within the ninety feet on either side of the canal. No such prohibition is found in the defendants' charter; nor does it appear that this ninety feet is necessary to the free navigation, or for the enlargement of the canal. No such enlargement appears to be contemplated by the complainants; nor are we prepared to say that they would be justified in making it, or are prohibited from selling the ninety feet the same as other canal lands. It is not a part of the canal, like the tow-path, but a part of the canal lands, and as such to some considerable extent, at least, had been sold by the State previous to the transfer to the trustees, and by them since.

Lastly, we come to consider whether the effect likely to be produced by the opening of the road, in the diminution of the revenues of the canal by withdrawing from it a part of the business, which it would otherwise do, makes the charter of the road a violation of any of the provisions of the laws which constitute, on the part of the State, the contract with the trustees. The provision which it is claimed has been thus violated is found in the fifteenth section of the law of 1843. That provision, as already quoted, grants the right to the trustees to establish a tariff of tolls to be paid for transportation upon the canal, and to collect the same; which the legislature may increase, but shall not reduce without the consent of the trustees. It is insisted, that if the legislature cannot reduce the tolls upon the canal directly, they cannot diminish them indirectly, by authorizing the construction of a rival communication. That if this may be done, by the construction of this road, the legislature

might, with equal propriety, construct a free canal along-side of this, and thus utterly destroy its revenues. This argument is answered by the Supreme Court of the United States in the case above referred to. Upon this point, in speaking of the complainants' charter, the Chief-Justice says: "This act of incorporation is in the usual form, and the privileges such as are commonly given to corporations of that kind. It confers on them the ordinary faculties of a corporation for the purpose of building a bridge; and establishes certain rates of toll which the company are authorized to take. This is the whole grant. There is no exclusive privilege given to them over the waters of Charles River above or below their bridge. No right to erect another bridge themselves, nor to prevent other persons from erecting one; no engagement from the State that another shall not be erected, and no undertaking not to sanction competition, nor to make improvements that may diminish the amount of its income. Upon all these subjects the charter is silent, and nothing is said in it about a line of travel so much insisted on in the argument, in which they are to have exclusive privileges. No words are used from which an intention to grant any of these rights can be inferred. If the plaintiff is entitled to them it must be implied simply from the nature of the grant, and cannot be inferred from the words by which the grant is made." The court then proceeds to show that although another bridge had been erected along-side of the complainants', and had been made a free bridge, and thus rendered it valueless, "All the franchises and rights of property enumerated in the charter, and there mentioned to have been granted to it, remain unimpaired." So in this case, every thing granted to the complainants remains unimpaired. Their right to the property conveyed is not taken from them, and their right to levy and collect as high a rate of tolls as they please upon property transported upon the canal remains as vital as it ever was. In the fifteenth section of the act of 1843, the legislature expressly stipulated that they would not reduce the tolls without the consent of the trustees. It would be torturing this provision, rather than a liberal construction of it, to say that the legislature thereby intended to tie up the hands of their successors so that they could never sanction or construct any other mode of communication, or do any other act, the tendency or effect of which would be to diminish the revenues of the canal by drawing away or diverting any business which might seek accommodation there; that the whole country which might once feel the beneficial influences of the canal, must, ever after, look to it as its highest good in the way of internal improvements. If to construct

this road violates the complainants' rights because it will diminish their revenues, then the Illinois Central with the Chicago Branch; the Chicago and Mississippi, and the Aurora Extension Railroads are all unconstitutional improvements, for they must each sensibly and palpably diminish or draw away the business of the canal; and the same remark must be made in reference to all roads running across the State south of the canal. Without these roads a very large amount of southern travel would pass up the Illinois River and through the canal, and thus help to swell its revenues, which will now seek a more expeditious accommodation by these railroads. It is not the contiguity of the road to the canal which renders it obnoxious to the complaint urged, but it is the fact of diminishing its revenues. The injury to the canal is none the less, because the business which it would otherwise receive is diverted at Cairo, at St. Louis, at Alton, or at Peru, or La Salle. The loss is as sensible and as injurious in the one case as in the other; nor is it of any moment, whether the business thus diverted is done along-side the canal or at a distance from it. When once diverted, it is gone, and it can be no relief to the complainants that it is done out of their sight and hearing. If the construction contended for should obtain, then, indeed, is this State in an unfortunate condition for the future. If the legislature has made a contract that they will do no act which shall ever diminish directly or indirectly the amount of tolls to be collected on the canal, a fatal blow was inflicted upon the prosperity and progress of the State, instead of securing a great benefit as was intended and supposed. In the case last quoted from, the court said: " But the object and end of all government is to promote the happiness and prosperity of the community by which it is established; and it can never be assumed that the government intended to diminish its powers of accomplishing the end for which it was created. And in a country like ours, free, active, and enterprising, new channels of communication are daily found necessary, both for travel and trade, and are essential for the comfort, convenience, and prosperity of the people. A State ought never to be presumed to have surrendered this power, because, like the taxing power, the whole community have an interest in preserving it undiminished. And when a corporation alleges that a State has surrendered for seventy years its power of improvement and public accommodation in a great and important line of travel, along which a vast number of its citizens must daily pass, the community have a right to insist, in the language of this court above quoted, ' that its abandonment ought not be presumed in a case

in which the deliberate purpose of the State to abandon it does not appear.'" Does such deliberate purpose appear in this case? There is, indeed, no ground for pretence that any such purpose is expressed in any of the acts upon the subject. But can it be implied? Can it be presumed or inferred from any thing which is expressed in those laws? If so, then we must infer, in the absence of language expressing it, that a most suicidal act was done by the State government. We were reminded in argument, that in the case in 11 Peters, the court applied the rule of strict construction to the Charles River Bridge charter, and that under its influence the case was decided, while the twentieth section of the act of 1843, provides, that it should "be liberally construed in all courts of justice," and the legislature pledged its faith to supply by future legislation all such defects as might be found necessary to enable the trustees to carry into full effect the fair and obvious intent of the act. This most clearly enjoins upon the court to give this law a liberal construction to accomplish the purposes of the trust, and I feel warranted in saying that it has ever received a liberal construction by this court in favor of the trustees. But while we would give the law a liberal construction to effectuate its purposes, there must be some limit to inferences and implications when it is thus sought to deprive the legislature of its most essential powers to promote the welfare of the people. While by a liberal construction we may be authorized to infer some things in favor of the trustees, where we are satisfied they were fairly in the contemplation of the legislature, although not fully expressed, it does not follow that we shall infer every thing against the state government whether they could reasonably have intended it or not. Can we, from any thing, either in or out of this law suppose, that if an amendment had been proposed expressly relinquishing the power to authorize future improvements, which might in some respects accommodate the public trade and travel better, and thus in a certain degree become a competitor with the canal for business, that it would have been adopted and made a part of the law? Can it be suspected that the bondholders would ever have asked, or that they ever expected such a surrender of sovereign power, so vitally important to the welfare of the State? If such were the intentions of the legislature and the bondholders, then were new bonds imposed upon the State vastly more grievous to be borne than the old. But this was never in the contemplation of either party. Before the negotiation was closed, the bondholders suggested certain alterations to the law which were passed in 1845, and the ingenuity of men seems to have been exerted to re-

move ambiguities, and to leave as little as possible to implication, and we cannot doubt, that had those who were to advance the money expected to enjoy this extensive monopoly of trade as claimed, that they would have had the right expressed in clear and unequivocal terms. There was another important sovereign right relinquished, that of taxation, but this was done in the most express terms, and had they designed to resign this other and still more important public right, because more extensive in its influences, it would have been done in an equally unambiguous manner. But as regards this question, there is no ambiguity in these laws. There is no expression to be found pointing towards a relinquishment of this right. The stipulation act to reduce the tolls clearly points to those tolls which the trustees were authorized to levy upon the commerce of the canal, and to nothing else. The palpable meaning is, that if the trustees fixed a given toll upon a boat, a passenger, or an article of commerce navigating the canal, the legislature should not reduce the toll thus fixed without the consent of the trustees. It seems to us that no one can read the fifteenth section, and come to any other conclusion than this. It is the first and last impression produced upon its perusal, which no ingenuity of argument seems able to weaken.

Who shall anticipate the new modes of intercommunication which the ingenuity of this wonderful age may devise, or the improvements which may be made in the old? Who can set bounds to the wants in this respect which new developments may suggest, and shall we imply or intend, even with the aid of the most liberal rule of construction, that the legislature designed to surrender the right to allow the people to avail themselves of improved modes of communication or commerce? Had the bondholders deemed such a surrender of sovereign power essential to their security, or practicable to be obtained, an express provision to this effect would have been suggested in the amendments asked in 1845, especially when they deemed it necessary to ask an amendment expressly providing that a majority of the trustees might act, and control the board. The subscribers to the loan must have been aware of the rule of construction which obtains, both in the courts of this country and of England, on the subject of the surrender of sovereign power to corporations, and acted and negotiated in view of it. There is nothing to induce the belief that they estimated such a surrender as part of their security, or supposed it had been made by the State. In making the negotiations they estimated the future, and while they anticipated the growth of the

country and the increase of business, they must also have estimated the chances of rival channels of trade which the wants of the country might bring into existence, and with which they might be surrounded. We are satisfied, that no portion of the contract between the State and the complainants was violated by the grant of the charter of the Chicago and Rock Island Railroad, and that the complainants' bill was properly dismissed in the court below.

The decree is affirmed.

*Decree affirmed.*