## COLORADO E. RY. CO. *v.* UNION PAC. RY. CO.

### (*Circuit Court, D. Colorado.* February 17, 1890.)

1. **RAILROAD COMPANIES—FRANCHISES—EMINENT DOMAIN.**
   A railroad company incorporated under a statute making it a common carrier is not rendered a private enterprise, so as to deprive it of the right of eminent domain, by the fact that it is poorly constructed, and terminates at a coal-mine belonging to the corporation, when it appears that it carries the mails, passengers, and freight, runs regular trains, and has expended about $280,000 in building its road, and acquiring its right of way.

2. **SAME.**
   Where land sought to be condemned by a railroad company lies on the direct line between the end of its road, as built, and the terminus at which it aims, the fact that it could reach such terminus, by a circuitous route, without crossing such land, does not show that the land is not necessary for the construction of the road.

3. **SAME.**
   Land which is owned by a railroad company, and which it expects at some future time to use for railroad purposes, but which it has held for five years without using it in any way, is subject to condemnation for the right of way of another company.

4. **SAME—TERMINI.**
   A railroad company whose charter gives it the right to build its road "from" a certain city is not barred from making the Union depot in such city its terminus by the fact that it began to construct its road from a point in the outskirts of the city, and for some time ran trains from such point, when it appears the company never made any permanent improvements at such point, and that from the first it made efforts to extend its line to the Union depot.

At Law.

*Rogers & Cuthbert*, for plaintiff.
*Teller & Orahood*, for defendant.

PHILIPS, J. This is a proceeding for condemnation. The petitioner claims to be a railroad corporation organized under the laws of the state of Colorado. The land sought to be condemned belongs to the defendant, a railroad corporation, and comprises 7.63 acres lying within the corporate limits of the city of Denver, and on the line of petitioner's survey from the city limits to the Union depot in said city. The land is claimed to be a necessity to petitioner for freight and storage buildings, switch-yards, turn-outs, engine houses, and the like. Its right to maintain this proceeding is assailed vigorously by defendant on various grounds, principal among which are the following: That the petitioner is not such a railroad as in contemplation of law would entitle it to exercise the right of eminent domain; that the use it seeks to apply the land to is rather private than public; that the land is not of such necessity to it as to justify the taking from defendant; that this land had already been applied by the defendant to its own use as a public railroad, or that it is of such eminent necessity to its prospective business as ought to restrain the court from wresting it from defendant for the use of another company; and, finally, that the petitioner had already located its road, and established its terminus, at the city of Denver, and has therefore exhausted its power for a further extension, or the establishment of another terminus at the Union depot, as sought by this proceeding.

Ordinarily, in a condemnation proceeding, the rule of law is that the petitioner presents a *prima facie* right by showing, by its charter, that it is a railroad corporation under grant from the sovereign power, a user under its franchise, and a necessity for the land sought to be taken for its use. The petitioner was incorporated in January, 1886, under the general corporation law of the state. It was incorporated under the name and style of "The Denver Railroad & Land Company." The second article thereof declares:

"Its objects are to locate, construct, and operate a railroad, and the necessary line of telegraph connections therewith, from the city of Denver, in the county of Arapahoe, and state of Colorado, in an easterly direction to Sand creek, and elsewhere, with the necessary branches from its main line to its other lands, all in said county of Arapahoe; to acquire, by gift, grant, devise, or otherwise, lands and other property; and to do a general railroad business under the laws of Colorado."

In July, 1886, its articles were amended, conformably to the statute, by striking out the words "and elsewhere" in the above-quoted article, and inserting, in lieu thereof, the words "and from thence to a point on the coal-lands of the company in township 3 S., of range 65 W." On the 14th day of January, 1887, the articles were further amended by changing the name of the company to that of "The Denver Railroad, Land & Coal Company." And finally, on June 8, 1888, the articles were again amended by changing the name to that of "The Colorado Eastern Railway Company." By the second article of this amendment—

"Its objects are to locate, construct, and operate a railroad, and the necessary line of telegraph in connection therewith, from the Union depot, in the city of Denver, county of Arapahoe, and state of Colorado, in an easterly direction, over, through, across, and upon the property, occupied or unoccupied, of individuals and corporations in the counties of Arapahoe and Elbert, in the said state of Colorado, to a point on the eastern boundary line of the said state of Colorado, to a point at or near the point where the south fork of the Republican river crosses said state line; and to locate, construct, operate, and maintain the said line of railway, and the said line of telegraph in connection therewith, from the said city of Denver, by the most eligible and practicable route, through the said counties of Arapahoe and Elbert to the eastern boundary line of the state of Colorado, with such branches, side tracks, switches, turn-outs, yards, stations, and other railway facilities and conveniences as may be necessary or desirable; and to acquire, by gift, grant, devise, purchase, or otherwise, lands and other property; and to do a general railroad business under the laws of the state of Colorado."

As the last amended charter is objected to by the defendant on the ground that it was made since the filing of the original petition herein, we will first consider the rights of the petitioner as they existed under the original charter and the first and second amendments.

1. The character of this corporation is first to be determined from the language of its charter. It is declared to be a railroad, to be operated as such between given points, with necessary lines of telegraphs, and with power to construct branches. As incident to its apparent character, the general statute law of the state imposed upon it the burden and duty of acting as a common carrier of freight and passengers. The question, therefore, arises, is there anything further expressed on the face of the grant so qualifying and limiting the general expressed power of the company as to indicate that its real object was to promote merely a private enterprise, disassociated from the public interest? Its further declared object is to extend its road in an easterly direction to Sand creek, and from thence to a point on the coal-lands of the company in township 3, range 65, with the necessary branches from its main line to its other lands in said county. Does the fact that the grant authorizing the company to extend its road from the eastern designated point of Sand creek to its coal-lands, with branches to its other lands, *ex vi termini*, destroy or take away its character as a public railroad corporation? I am unable to discover sufficient reason or authority for such conclusion. In the *first* place, if this extension can be deemed a special power, it in no sense is inconsistent with, or contradictory of, the general terms of the grant, so that they may not stand together; and, *second*, the power to build to the coal or other lands of the petitioner, without more, should, in favor of the legality of the franchise, be considered as merely designating the terminus of the eastern extension of the road, or the termini of its branches, and not as a palpable indication that the real motive of its promoters was to develop their coal fields, and conduct a private traffic in their products. If such object in fact existed, it was *in pais*, and must be found in evidence *dehors* the record.

In support of defendant's contention that this road did not rise to the dignity of a public thoroughfare, such as the legislature intended to

clothe with the power to exercise the right of eminent domain, its evidence tends to show that this road was constructed in a very unsubstantial and primitive fashion; the track was a three-foot gauge, constructed out of indifferent rails and ties, not adapted to the support of heavy freight trains, nor secure for the rapid carriage of passengers; that the rolling stock thereon consisted of very small-sized engines, and the freight-cars were small; and adapted mainly to the transportation of coal, and that the rate of speed attainable was not over six or eight miles an hour; that the buildings erected at its terminus at Denver consisted of a frame house, of small capacity, used for a passenger depot, and its other buildings were principally sheds used for coal-chutes, and that its business for the first year consisted almost entirely in carrying coal from its mines to Denver; and that its capital stock, nominally of $500,000, was represented in the proportion of four-fifths by its lands. On the other hand, the petitioner's evidence tends to show that the petitioner had built this road, beginning in 1886, from a point known as "Twinings," in the eastern outskirts of the city of Denver, to Sand creek, a distance of about 8 miles, and on to its present terminus, at a station named Scranton, making a distance in all of about 17 miles, with several intermediate stations established along its line; that its construction cost about $80,000; that the country through which it ran was but sparsely settled, and at first there was but little of freight, and few passengers, carried over its line, but that the population had increased, as also the amount of freightage from outside sources; that the carrying of coal from its mines had long ceased, except for supplying its engines, and that since that time its business had consisted almost entirely in the transportation of passengers and freight for the public; that the smaller engines at first employed upon its road had been exchanged for one or more of larger capacity, obtained from the Rio Grande Railroad. With the exception of about two days, occasioned by the washing away of its bridge over Sand creek, its trains from the first, up to this time, have run daily, carrying the United States mails, and passengers from the different stations, to and from Denver, and all the freight tendered it from every source, consisting of the products of husbandry produced by the limited number of farmers, and carrying from Denver lumber for buildings and fencing, and such other supplies as are ordinarily bought by such people in the markets. It also had and published the customary time-card; and, furthermore, it had from the beginning been its purpose to extend its road further east, and that it had taken some preliminary steps looking to such projection; and also that it had been its object from the outset to reach the Union depot, in Denver, and to this end it had expended, as claimed by its principal officer, some $200,000 in procuring a right of way through the city. There was some evidence on the one part tending to show that agents of the petitioner, in obtaining the right of way from property holders along the line of this road east of Denver, represented to them that this road was only designed as a way for getting to the coal-mines and transporting coal; and, on the other hand, there was evidence that such agents represented to parties that it would afford fa-

cilities for the people along this line to reach the Union depot in Denver with their travel and freights.    I attach little importance, in the consideration of this case, to this latter incident.

On the state of facts developed, a *quo warranto*, at the relation of the state, would not lie against this road as for abuse or misapplication of its charter.    Equally should such facts constitute such user of a railroad, coupled with its apparent character upon the face of its charter, as to bring it within the rule of *prima facie* right to condemn land as for a public use.    Its beginning may have been small; but, if the right to exercise the power of eminent domain should have been denied in the early history of railroads in this country because of their small beginnings, it is not too much to say that some of the great, mammoth railroad enterprises which have developed and strengthened the commerce and wealth of the country would have perished in their infancy.    In *Chicago & N. W. R. Co.* v. *Chicago & E. R. Co.*, 112 Ill. 601, the court say:

"The company, as we have just seen, was organized under a valid charter, and is shown to have done corporate acts under it.    That was sufficient to establish a *prima facie* right to take the property in question;  *  *  *  and this *prima facie* right cannot be successfully assailed in a mere collateral proceeding, as is sought to be done here."

And in the later case of *Ward* v. *Railroad Co.*, 119 Ill. 287, 10 N. E. Rep. 365, the chief justice says:

"There is some proof that the petitioner is a corporation *de facto*, and that is all the law requires in this class of cases.    There is evidence, although it may be slight, of corporate acts done by petitioner.    It appears that an engineer has been appointed, the line of the proposed road has been located, and other steps taken towards the building of the road.  *  *  *  These are corporate acts, and tend to show petitioner is a corporation *de facto.*"

It does seem to me that the right of eminent domain should not necessarily be denied to a railroad corporation because of the fact that the primary and chief inducement moving its promoters was to develop private coal-mines, and bring their products to market.    "The true criterion by which to judge of the character of the use is whether the public may enjoy it by right, or only by permission, and not to whom the tax or toll for supporting them is paid."    Mills, Em. Dom. § 14.    And Lewis, Em. Dom. §§ 160, 161, asserts that:

"In determining whether the use in such case is public or not, it is an immaterial consideration that the control of the property is vested in private persons, who are actuated solely by motives of private gain.  *  *  *  'The inquiry must necessarily be, what are the objects to be accomplished? not who are the instruments for attaining them?'  *  *  *  'The public use required need not be the use or benefit of the whole public or state, or any large portion of it.    It may be for the inhabitants of a small or restricted locality, but the use and benefit must be in common, not to particular individuals or estates.'"

Or, as 1 Wood, Ry. Law, § 226, puts it:

"The question is whether it is of so much benefit or advantage to the community, either directly or indirectly, that it cannot be said to be wholly private in its effect and operation."

In *Railroad Co.* v. *Moss*, 23 Cal. 324, the court say:

"It is urged that the plaintiffs are constructing a railroad from a coal-mine in the mountains, through a desolate region, to navigable waters, to enable it to get coal ready to market, and that this is a mere private use, and therefore they have no right to appropriate the property of others to its purposes without their consent. * * * The plaintiffs, in common with other railroad companies organized under this act, are bound by these provisions which make it obligatory upon them to act as common carriers. * * * The fact that their road does not connect points of present commercial importance cannot affect the rights of the plaintiffs. Railroads often make commercial points by their construction, and a large and cheap supply of coal * * * is one of the great necessities of the state, and a matter in which the whole state is interested."

In the progress of civilization, municipal existence, as well as the maintenance of rural populations without timber supply, may be so dependent upon a large supply of coal for fuel as to render railroads for its transportation alone of imperative public necessity. It would in fact be difficult to conceive of an object of greater public use. It is as much so as the freightage of breadstuffs, meats, and other necessary supplies for human sustenance in our large cities, or compact communities, dependent upon exterior sources for their production. It would be no answer to their claim to be public corporations to say, for instance, that a community like Denver was not wholly dependent upon this road for its supply of fuel, as there are other railroads which may bring such supply. Competition is not only the life of trade, (or at least is yet supposed to be by the common people,) but the multiplication of products, and the facilities for getting them to market, tend to cheapen the necessaries of life to the masses; and in the most beneficent and legitimate sense they should retain their character as public necessities. Government itself is maintained to promote the general welfare, and the right of eminent domain has its root in this soil. Be this as it may in the light of adjudications, certainly it comes both within the letter and the spirit of a public railroad corporation where such an object, as above indicated, is coupled with the obligation, inseparably affixed by the statute to the franchise itself, to become also a common carrier of passengers and freight, and the corporation actually performs such duty to the public. The evidence in this case shows that for the greater period, and in the latter years, of the existence and operation of this road, its business has been confined principally to the carrying of passengers and general freight, however small it may have been. What is said by DEPUE, J., in *De Camp* v. *Railroad Co.*, 47 N. J. Law, 44, respecting a like proceeding, where a railroad began in a mine, is quite pertinent:

"This enterprise does not lose the character of a public use because of the fact that the projected railroad is not a thoroughfare, and that its use may be limited by circumstances to a comparatively small part of the public. Every one of the public having occasion to send materials, implements, or machinery for mining purposes into, or to obtain ores from, the several mining tracts adjacent to the location of this road, may use this railroad for that purpose, and of right may require the company to serve him in that respect; and that is the test which determines whether the use is public. Nor will any

motive of personal gain which may have influenced the projectors in undertaking the work take from it its public character. * * * A particular improvement, palpably for private advantage only, will not become a public use because of the theoretical right of the public to use it. But where the franchise is in its nature a public franchise, as the transportation of freight is, and the object promoted is one that concerns the public interests, as the development of the mining resources of a state does, the improvement is essentially a public benefit and advantage; and if there be no restriction on the right of the public to use it, and no inability to use it, except such as arises from the circumstances, the court, in determining whether the improvement is such a public use as that the right of condemnation shall extend to it, will not scan closely the number of individuals immediately profited by it. Indeed, it would not be possible to indicate the number of persons, or define the area of the limits, to which the benefit of such an improvement may extend."

2. Is the land sought to be condemned necessary to the petitioner? No serious question is made in argument but that the quantity of land, and its local fitness, are useful, and eminently suited to the purposes of the petitioner for necessary store-houses, switches, and turn-outs, and the like. In fact, it is the only piece of ground lying between the present eastern terminus of the road, at the outskirts of the city, and its objective point, the Union depot, available for, or adaptable to, such use, without entirely changing the surveyed line, and undertaking to accomplish its destination by a circuitous route to the north of the city. It is insisted, however, by defendant that it is feasible and practicable for petitioner to reach the Union depot by such detour, and thereby leave the ground in controversy to defendant. The rule of law, ordinarily, is that "the selection of the land to be taken rests in the discretion of the corporation." Wood, Ry. Law, 660. Chief Justice DICKEY, in *Railroad Co.* v. *Dunbar*, 100 Ill. 112, says:

"If there be no other limitation of its power by their statutes, it is obvious such a railroad company may, as a general rule, select its own route, fix its terminal points, and lay out its road."

In the very nature of things, a large discretion must be accorded to the engineer and agents of a railroad company in determining the route to be taken, and where its side tracks, turn-outs, switches, and depot houses shall be located, with respect to convenience and successful operation, subject, as a matter of course, to judicial supervision to confine such discretion within proper limits. *Railroad Co.* v. *Dix*, 109 Ill. 244; *Forney* v. *Railroad Co.*, 36 N. W. Rep. 806, 33 Amer. & Eng. R. Cas. 162, and note; *Mobile & G. R. Co.* v. *Alabama M. R. Co.*, 6 South. Rep. 404. Petitioner's engineer testified to the necessity of this route and selection. From the map in evidence before the court, from the topography of the country, and the character of the improvements where this road would have to run to otherwise reach the depot, it does not appear to the court to be within a sound judicial discretion to disregard the judgment of the engineer and officers in selecting the route and ground in question. The route is the shortest, and most natural. It follows the lowland near the bed of the Platte river, runs parallel with defendant's road, between it and the river, and far enough

from defendant's road not to interfere therewith, and over ground little desirable or available for other business use or habitation. Besides which, as appears from evidence, the petitioner has expended large sums of money in securing the right of way on this survey, and has in successful progress other condemnation proceedings to complete this mode of access to the Union depot. It would therefore be harsh for the court to force it to abandon and sacrifice all it has struggled for and paid for, in this direction, by turning it upon a longer course, hedged about by probable new contentions and obstacles, and unknown expenditures and delays. Considerations alone of other conflicting public interests, or other paramount rights, could justify such judicial determination. *Vide Mobile & G. R. Co.* v. *Alabama M. R. Co.*, 6 South. Rep. 404.

3. It is next insisted by defendant that the land sought to be condemned has already been appropriated by it to its use as a public railroad corporation, or at least that it acquired it by purchase, with a view to such use, and that it is highly probable it will in the near future become a necessity to its increasing business. The evidence shows that this land is a part of a body of 12 acres which was purchased by one McCullah, in 1881, for defendant. This witness stated:

"I received my orders to purchase it from Mr. Egbert, [representative of defendant road.] He told me to go and buy it; buy it quick, before the Burlington parties could get it."

The Burlington was the Burlington & Missouri Valley Railroad, about to build into Denver, and seeking terminal facilities. Mr. Choate, superintendent of defendant road, testified, substantially, that this piece of land was acquired for the reason that the Burlington Railroad was trying to get an entrance into the city, and to injure defendant's property, and it was necessary to buy this to keep that road from getting into their yards. He further stated that in his opinion this land would in the near future become necessary for the use of defendant, for additional turn-outs and switch-yards, and that they would have so improved it but for the lack of funds, and it was yet their purpose to so use it. It appears, however, from the evidence, that the only work done upon this piece of land was the construction of some embankments along or across it prior to 1885, and before Mr. Choate took charge as superintendent. These embankments have washed away somewhat, and were on grades below that of defendant's railroad track, and not at an elevation at all suitable for switches or turn-outs from the main track. No buildings of any sort have ever been constructed upon it, and no other use made of it. Without imputing to the defendant company the selfish and indefensible motive of being actuated in the acquisition of this land by a desire to obstruct the Burlington road's access to the Union depot, the very utmost that can be conceded to the defendant is that it entertained the belief that this piece of ground might become necessary to the full accommodation of its business in the future, and that it expects to so apply it. This is but a prospective dedication, which may or may not ever be made. If the defendant were seeking to condemn this property upon a prospective increase of its business, "it should be

established beyond reasonable doubt that such increase will occur." *Railroad Co.* v. *Davis*, 43 N. Y. 145. While not holding defendant to the same rigorous rule as if it were seeking to condemn this property, yet "no one can blink so hard as not to see," from the evidence as a whole, that the defendant has not for five years done any other act looking to the subjection of this piece of ground to its use; and, if it is held exempt from the exercise of the right of eminent domain, it rests for its foundation upon conjecture, or a contingency that no court can say with assurance will ever arise. The evidence shows that this defendant has a large amount of other land, some 275 acres, in Denver, appurtenant to its line of railroad, a part of which, at least, can be made quite available for any use similar to that for which it claims to hold this. In view of its greater necessity to the petitioner, as already demonstrated, I feel constrained to hold, both on reason and authority, that this mere prospective use by defendant should yield to the more immediate necessities of the petitioner. *Springfield* v. *Railroad Co.*, 4 Cush. 63; *Illinois & M. Canal Co.* v. *Chicago & R. I. R. Co.*, 14 Ill. 314; *Prospect Park* v. *Williamson*, 91 N. Y. 552; *Eastern R. Co.* v. *Boston & M. R. Co.*, 111 Mass. 125; *Grand Rapids, N. & L. S. R. Co.* v. *Grand Rapids & I. R. Co.*, 35 Mich. 265, 24 Amer. Rep. 545, and note. Mere priority of acquisition, or even of occupation, gives no exclusive right, except in so far as the condemnation trenches upon the greater necessities of the other franchise. *East St. L. C. Ry. Co.* v. *East St. L. U. Ry. Co.*, 108 Ill. 265; *Lake S. & M. S. Ry. Co.* v. *Chicago & W. I. R. Co.*, 97 Ill. 506.

4. It is finally contended by defendant that petitioner had hitherto exercised its right of location of its road, and had fixed its western terminus at a point known in evidence as "Twinings," in the eastern suburbs of the city of Denver; that, having once exercised the power granted, it was exhausted. This rests upon the rule of the common law that if a man once determines his election it shall be determined forever. Com. Dig. tit. "Election." The sense of this rule is very aptly and perspicuously expressed by Lord ELDON in *Blakemore* v. *Canal Navigation*, 1 Mylne & K. 154:

"When the canal is completed, the powers of the company are exhausted, and in making the canal the proprietors * * * are not at liberty afterwards to injure the interests of parties by making what is quite a different canal."

Leaving out of view, for the time, the Colorado statute hereinafter noticed, had the petitioner, as a matter of fact, made such election of location of its terminus at Denver, when it instituted this proceeding, as to authorize the court to say it had exercised and exhausted all the power granted it under its original charter? This charter gave it the right to build its road "from Denver." It is not too much to say that no court would now meet the trend of judicial advancement in holding that the term "from Denver" did not confer on this company the power to build to any point within the city. In *Morris & E. R. Co.* v. *Central R. Co.*, 31 N. J. Law, 211 *et seq.*, it was held that the term "between two towns" would very clearly include the right of carrying such road into

each place. "To the city of Austin" has been held to impart an authority to extend the road within the corporate limits. *Railroad Co.* v. *Odum*, 53 Tex. 343. *Vide People* v. *Railroad Co.*, 89 N. Y. 75; *Turnpike Road* v. *Coventry*, 10 Johns. 389; *Mohawk Bridge Co.* v. *Utica & S. R. Co.*, 6 Paige, 554; *Mason* v. *Railroad Co.*, 35 Barb. 377; *Chicago & N. W. R. Co.* v. *Chicago & E. R. Co.*, 112 Ill. 599. Unless, therefore, it affirmatively appears that the petitioner had made its election, evidenced by some act permanent in its character, to fix the eastern terminus of its road at Twinings, its original charter unquestionably conferred upon it authority to build to the Union depot. As said in *Childs* v. *Railroad Co.*, 33 N. J. Law, 327:

"The mere fact that they [the railroad company] have been running their cars over this road-bed, in the condition in which it was left by the superseded company, cannot give rise to the implication that they considered or treated the road as completed. If, in point of fact, this road has been used and treated as a finished road by this company, such fact should have been manifested to the court. The mere circumstance that cars have been run upon it is not of itself sufficient, as such is often the case on incomplete roads."

A fair and reasonable construction of the evidence touching this issue leads to the conclusion that the petitioner never intended, by beginning or stopping at the point Twinings, to treat that as an elected terminus of the road; and the facts and circumstances tend to show that it was but a temporary expedient. As claimed by counsel for defendant, the character of the structures and improvements at this station were the most trifling and temporary. Manifestly, the road stopped there because it could get, at that time, no nearer its western destination. In the very month (January, 1886) of the original incorporation, the evidence shows that the company applied to and obtained from the city of Denver an ordinance allowing it to locate its road from Twinings westward down Wewatta street, in the direction of the Union depot, and of the lands in question; and in March, 1887, it secured from the city another ordinance, which allowed the further construction of its road on said street as far as it was opened. It had actually proceeded to lay its track on Wewatta street as far as it was open; and the evidence shows that it has been almost continually making efforts to secure this outlet, expending therefor large sums of money. Under such state of facts, I do not feel warranted in holding that the petitioner ever regarded or treated Twinings as its terminus. Its stay there was rather a matter of compulsion than of election.

In addition to this, at the time of the incorporation of petitioner the General Statutes of the state (section 127, c. 19, tit. "Corporations") provided:

"It shall be competent for any railroad or telegraph company or coporation, upon a vote in person or by proxy of two-thirds in value of its stockholders, at any meeting thereof, to alter and amend its articles of association so as to change its termini, or so as to extend the length of the line thereof from either of its termini to such further and other point as they may determine, or for the purpose of constructing branches from its main line; and upon

such vote the said company may make articles amendatory of their original articles, for the purpose of extending or changing the line of its road, or for constructing branches from its main line, as aforesaid."

And then, after providing for the proper recording, etc., of such amendment, the section closes as follows:

"Such amendment, amendments, or alterations shall have the same force and effect as though said amendment or alteration had been included in, and made a part of, and embraced in, its original articles of association."

The evidence shows that on the 8th day of June, 1888, the petitioner availed itself of this statute by which its line of road might be extended from Scranton eastward to the line between the states of Colorado and Kansas, designating the Union depot as its western terminus, and also changing the name of the corporation to that of "The Colorado Eastern Railroad Company." These facts are set up in the amended petition on which the parties have gone to trial. The defendant makes two objections to this claim of the petitioner: *First*, that the said provision of the statute applies only to the instance of a corporation before it has built its road and established its termini; and, *second*, that this action was taken by the petitioner after the institution of this condemnation proceeding. Respecting the first objection, it must be conceded that there is nothing on the face of the section of the statute in question to indicate that such right of amendment was to be limited as contended by defendant. "To change its termini, or so as to extend the length of the line thereof from either of its termini to such further and other point as they may determine," would imply that the termini had been established, and the line of the road located. There is no limit on the face of the statute itself as to the time when this change may be made; but it may be done "at any meeting" of two-thirds in value of its stockholders. Certainly, if it had been within the mind of the framer of the law to put such a limitation upon its operation, some apt expression indicative thereof would have been employed. It might be sufficient, on language so broad, to say that the statute must stand for a reason. But, if one is to be given to justify a broader construction than that contended for by the learned counsel for the defendant, a most palpable one would present itself in the very history of the commercial life of the state of Colorado. Her mines of coal, silver, gold, and other precious metals are the chief sources of her wealth and prosperity. Without them, the state would fall far below her imposing attitude as a member of the Federal Union. The development of these mines is a matter of paramount importance to the commonwealth. A mine is discovered in her mountains. The excitement incident to such an event draws to it swarms of miners, prospectors, and speculators. Villages spring up at these points as the magic creation of a night. A charter for a railroad is obtained to reach such a point, and afford a market for its products, and bring supplies for the sustenance of the people gathered around. These mines, not infrequently, are soon exhausted and shut down, and as suddenly as they were created the villages disappear. Other mines further on are discovered, and the history just given repeats itself. New towns are con-

tinually springing up in a new and rapidly growing state. Recognizing the general rule of law contended for by defendant, that a road once located, and a terminus once fixed, is an exhaustion of the power granted, the legislature must have intended by this very provision of the statute to remove this obstruction, and meet the very necessities of her peculiar condition.

Counsel for defendant seeks authority or reason for his construction of said statute by reference to section 115 of the same chapter; to understand which we must go back to section 110, which provides, *inter alia*, for a change of the name, the place of business, the increase or decrease of the capital stock, or a change of directors, or for consolidation of such corporation. Section 115 declares that—

"Such change of name, place of business, increase or decrease of capital stock, increase or decrease of number of directors, managers, or trustees, or consolidation of one corporation with another or with others, shall not affect suits pending in which such corporation or corporations shall be parties; nor shall such change affect causes of action, nor the rights of persons, in any particular; nor shall suits brought against such corporation by its former name be abated."

The argument made on this is that, as this section provides that such change of name, place of business, increase or decrease of stock and directors, etc., shall not affect suits pending, nor causes of action, nor the rights of parties, etc., this inclusion indicates a purpose to exclude from its operation the change of termini or the line of road, and therefore it was not contemplated that any change of the latter character could take place in a "going concern." On this, I submit the following observations: The provision respecting the change of termini occurs in a subsequent section of the statute; and, it is but reasonable to say, doubtless the legislature assumed that the provision of section 115 would apply equally to the amendment provided for in section 127, as no reason occurs to my mind for any distinction in the matter of pleading and suits respecting these provisions. "The intention of a legislative act may often be gathered from a view of the whole and every part of the statute, taken and compared together. When the true intention is accurately ascertained, it will always prevail over the literal sense of the terms. * * * And when it is doubtful whether a certain thing falls within the terms used in an act it is proper to resort to other statutes to ascertain the intention of the legislature in the enactment of the general statute. * * * A thing within the intention of the legislature in framing a statute is sometimes as much within the statute as if it were within the letter." *In re Bomino's Estate*, 83 Mo. 441. Said section 127, authorizing such alteration or amendment, being in the statute at the time of the grant of petitioner's charter, this provision was as much a part of the grant as if it had been incorporated expressly in it. Therefore, in so far as third parties are concerned, or those dealing with the corporation, or with whom the corporation might come to deal, they would be subject to the rights and privileges conferred by this statute. Amendments are allowed by the courts with great liberality where no material

rights of the other party are affected or changed, and where no great prejudice could likely ensue. The only possible effect of allowing this objection would be, if the petitioner's right to proceed depended upon this amendment, to turn it out of court, and compel it to begin *de novo.* Nothing thereby would be gained by the defendant except delay; and it does seem to me that the very spirit of the law should compel the court, in such instance, to let the cause proceed. Under the view, however, I have expressed of the petitioner's right under its charter as it existed at the date it instituted this proceeding, it was not necessary for it to invoke the amendment of June 8, 1888, to enable it to reach the Union depot.

Other matters might with propriety be discussed, arising on the evidence and the argument of counsel; but, as they are not determinate in their character, and this opinion has already been greatly extended, further discussion is forborne. It results that the issues on hearing are found for the petitioner, and judgment will be entered accordingly.