**UNITED STATES v. CITY OF CHESTER et al.**

No. 8490.

Circuit Court of Appeals, Third Circuit.

Argued Feb. 24, 1944.

Decided July 17, 1944.

As Amended Aug. 10, 1944.

Theodore Smithers, of Chester, Pa. (Vincent P. Desmond and J. Harold Hughes, both of Chester, Pa., on the brief), for appellants.

Howard E. Stern, Samuel Feldman, and Robert McCay Green, all of Philadelphia, Pa., and Charles S. Rhyne, of Washington, D. C., for amicus curiae.

Joseph E. Gold, Asst. U. S. Atty., Washington, D. C. (Gerald A. Gleeson, U. S. Atty., of Washington, D. C., Francis M. Shea, Asst. Atty. Gen., and Dick Cutter Smiley, Atty., Department of Justice, of Washington, D. C., on the brief), for appellee.

Before BIGGS and JONES, Circuit Judges, and BARD, District Judge.

BIGGS, Circuit Judge.

The primary question presented for our determination is whether the City of Chester, Pennsylvania, can compel an agency of the United States Government, viz., the United States Housing Authority,[1] acting through the National Housing Agency,[2] to comply with local building regulations in building emergency housing to house war workers in Chester. Chester's answer alleges failure on the part of the United States to comply with Section 4 of Article 1 of the City's Building Code Ordinance requiring the approval of an application and plans by its Building Inspector before any building may be constructed within the City.[3] The United States in its complaint avers that it "is exempted from complying

---

[1] Created pursuant to Section 3 of the Act of September 1, 1937, c. 896, 50 Stat. 889, 42 U.S.C.A. § 1403(a).

[2] The duties and functions of the United States Housing Authority were consolidated into a National Housing Agency by Executive Order No. 9070, February 24, 1942, 7 F.R. 1529, 50 U.S.C.A.Appendix § 601 note, pursuant to the authority of the First War Powers Act, December 18, 1941, c. 593, Title I, Sec. 1, 55 Stat. 838, 50 U.S.C.A.Appendix § 601.

[3] Article I, Section 4 of the Building Code Ordinance of the City of Chester is as follows:

"I. Approval of Application—It shall be unlawful to construct or alter any building, structure, wall, platform, staging or flooring, or any part thereof, or any plumbing and drainage, until the application and plans required by Section 3 of the article have been approved by the Building Inspector. The Building Inspector shall approve or reject any application or plan, or amendment thereto, filed with him pursuant to the provisions of this article within a reasonable time. If approved he shall promptly issue a permit therefor, provided the fees prescribed in paragraph No. 8 of this section have been paid within one year of the date of approval."

with the regulations, restrictions and specifications set up by the City of Chester * * * "[4] in the Building Code Ordinance by virtue of the provisions of Section 1 of the Lanham Act.[5] The defendants in their answer deny that "* * * the United States of America in carrying out its duties and functions as a sovereign power, is not subject to * * * regulations, restrictions or specifications promulgated by the City of Chester, * * *," and aver that the United States "* * * has violated the express provisions" of the ordinance.[6] The City of Philadelphia, in which there are also a number of emergency housing projects, and the National Institute of Municipal Law Officers were heard as amici curiæ and filed briefs in aid of the defendants. The Philadelphia Housing Authority has filed a brief as amicus curiæ supporting the position of the United States.

The essential facts are not in dispute and may be stated briefly. The National Housing Agency in order to erect houses for emergency housing on April 28, 1943, entered into a contract with Domenico Lo Cascio to construct one hundred fifty dwellings in Chester. The lands were selected for that purpose by the Chester Housing Authority (an authority created by the Housing Authorities Law of the Commonwealth of Pennsylvania, 1937, May 28, P. L. 955, 35 P.S.Pa. § 1541 et seq.) and acquired by condemnation proceedings brought by the United States in the District Court of the United States for the Eastern District of Pennsylvania.[7] The dwellings were to be of a temporary construction designed for the present war emergency in order to obviate a shortage of housing for war workers in the Chester area. The defendants do not deny that a shortage of dwellings existed at the time of the happening of the events complained of by the United States.[8]

Thereafter, on May 6, 1943, the Building Inspector of Chester and the City Solicitor advised the Chester Housing Authority not to proceed with the construction of the project until a permit had been secured and the plans for the project had been made to comply with the provisions of the Building Code Ordinance. The Chester Housing Authority made no effort to secure a permit or to cause the plans of the project to comply with the ordinance. Such a gesture would have been futile because shortages of critical material would have rendered it virtually impossible to build the project in accordance with plans which would have been approved.[9]

On May 17, 1943 the contractor, through Renato Da Vito, his contract superintendent, began the construction of a tool shed on the leased premises. One day later, an information was filed by the Building In-

---

4 Paragraph 14 of the complaint, appendix p. 7a.

5 The Act of October 14, 1940, c. 862, Title I, 54 Stat. 1125 as amended, 42 U.S.C.A. § 1521.

6 Paragraph 14 of the answer, appendix p. 13a.

7 Civil Action No. 3154. The land, consisting of 13½ acres, was taken by way of leasehold and not in fee simple.

8 Counsel for the plaintiff in offering certain testimony said that he desired * * * to show the need for housing in the City of Chester". The City Solicitor stated, "We do not deny that." Appendix p. 35a. Some of the major industries in the Chester area include industrial plants, yards for building ships, oil refineries and textile mills, industries necessary for the national defense and for waging war. See appendix p. 26a.

9 There is evidence from which it could be found and indeed it seems tacitly to be conceded by the defendants, that it would be difficult, if not impossible, to comply with the Building Code Ordinance of the City of Chester in view of the restriction of critical materials by the War Production Board. This is true in respect to several items and particularly in regard to plumbing. The real objection of the City of Chester to the project seems to lie in the fact that the dwellings to be built under the project might not be removed at the end of the emergency. See the letter of the City Solicitor, Exhibit C of the complaint, appendix p. 10a. This fear is expressed by the City Solicitor despite the provisions of the Act of October 14, 1940, c. 862, Title III, Sec. 313, as added July 7, 1943, c. 196, Sec. 4, 57 Stat. 388, 42 U.S.C.A. § 1553, which provides that the Administrator "* * * as promptly as may be practicable and in the public interest, remove all housing under his jurisdiction which is of a temporary character, * * *. Such removal shall, in any event, be accomplished not later than two years after the President declares that the emergency declared by him on September 8, 1939, has ceased to exist, * * *."

spector before a magistrate and a warrant was served upon Da Vito. At the hearing Da Vito's case was continued but he was warned under penalty of imprisonment not to proceed with the construction of the project until a permit had been secured. The United States then brought the suit at bar naming the City of Chester, the Mayor and Councilmen, the magistrate before whom Da Vito was taken, and other municipal officials as defendants and sought an injunction to restrain Chester and the other defendants from interfering with or obstructing the building of the project. After hearing, the court below issued a permanent injunction. See 51 F. Supp. 573. The appeal at bar followed.

The Lanham Act was passed in order to enable the Federal Works Administrator to provide housing for persons engaged in national-defense activities and their families in those areas in which the President of the United States should find that an acute shortage of housing exists or impends which would impede national-defense activities and that such housing would not be provided by private capital. Section 1 (a) of the Act provides that lands may be acquired for this purpose prior to approval of title by the Attorney General and without regard to the provisions of certain federal statutes, not pertinent here. Section 1 (b), authorizes the Administrator "By contract or otherwise (without regard to section 1136, as amended, and 3709 of the Revised Statutes, section 322 of the Act of June 30, 1932 (47 Stat. 412) [10] or any Federal, State, or municipal laws, ordinances, rules, or regulations relating to plans and specifications or forms of contract, the approval thereof or the submission or estimates therefor) prior to the approval of title by the Attorney General to make surveys and investigations, plan, design, construct, remodel, extend, repair, or demolish structures, buildings, improvements, and community facilities, on lands or interests in lands acquired under the provisions of subsection (a) hereof or on other lands of the United States which may be available. * * * Provided further, That where the Administrator shall consider that there is no reasonable prospect of disposing of such housing to meet a need

extending beyond the emergency he shall construct temporary units * * *."

Section 2 of the Act, 42 U.S.C.A. § 1522, states that "the term 'persons engaged in national-defense activities'" shall include "(1) enlisted men in the naval or military services of the United States; (2) employees of the United States in the Navy and War Departments assigned to duty at naval or military reservations, posts, or bases; (3) workers engaged or to be engaged in industries connected with and essential to the national defense; (4) officers of the Army and Marine Corps not above the grade of captain, and officers of the Navy and Coast Guard, not above the grade of lieutenant, senior grade, assigned to duty at naval or military reservations, posts, or bases, or to duty at defense industries: * * *"

By the Lanham Act, Congress has decreed that housing for persons engaged in national-defense activities, as defined in Section 2, is essential to the national defense.[11] Such legislation is clearly within the war powers granted to Congress by the Constitution. See provisions of Article 1, Section 8, clauses 11 to 16 inclusive. In Hirabayashi v. United States, 320 U.S. 81, 93, 63 S.Ct. 1375, 1382, 87 L.Ed. 1774, the Supreme Court by Mr. Chief Justice Stone stated, "The war power of the national government is 'the power to wage war successfully'. See Charles Evans Hughes, War Powers Under the Constitution, 42 A. B.A.Rep. 232, 238. It extends to every matter and activity so related to war as substantially to affect its conduct and progress. The power is not restricted to the winning of victories in the field and the repulse of enemy forces. It embraces every phase of the national defense, including the protection of war materials and the members of the armed forces from injury and from the dangers which attend the rise, prosecution and progress of war." While the opinion of the Supreme Court in the cited case dealt with the constitutionality of a curfew order imposed by the Military Commander of the Western Defense Command, the principles enunciated are interpretative of the powers given to Congress as well as to the Executive to wage war and to act in the national defense.

---

[10] These Acts refer to authorization for permanent barracks or quarters and other structures for the United States Army, to leases of buildings to the Government and like matters which need not be discussed in this opinion.

[11] See the express declaration of congressional intent set out in Section 1 of the Act of October 14, 1940, 42 U.S. C.A. § 1521.

■ Nor can it be considered necessary that the United States must be at war in order that Congress and the Executive possess the constitutional sanction to prepare for it. Such an interpretation would be so unrealistic as not to warrant serious consideration. Cf. United States v. 243.22 Acres of Land, D.C., 43 F.Supp. 561, 567, 568, affirmed 2 Cir., 129 F.2d 678.

Amici in support of the defendants assert that the definition contained in Section 2 (3) of the Act, quoted above is so broad as to encompass within its scope ". . . almost all of the inhabitants of the country, including those employed by concerns which are engaged in manufacture, processing, distillation or in any kind of activity supplementary or auxiliary thereto", and for this reason ". . . goes far beyond the legislative authority delegated by the States to Congress with respect to the war powers." This argument is without merit. It is difficult to believe that definitions of total war might vary and that one part of the united industry of our country might be at war while another portion is at peace, depending on whether the manufacture involved was of munitions or of goods for civilian consumption, but we do not have to decide such a question in the case at bar. A very large percentage of the industries in the Chester area are essential for the successful prosecution of the war. See note 8 supra. They are not industries "supplementary or auxiliary" to the war effort. They are industries whose curtailment would impede the prosecution of the war.

Further argument of the defendants and amici turns upon the scope of the Act and its constitutionality as construed by the court below. It is based on the Ninth and Tenth Amendments read in conjunction with Article I, Section 8, Clause 17 of the Constitution.[12] It amounts in substance to this: Since the Tenth Amendment expressly reserves to the States or to the people those powers not delegated to the United States or prohibited it by the Constitution, and the Ninth Amendment provides that the enumeration of rights in the Constitution shall not be construed to deny or disparage others retained by the people, and since the United States did not acquire the leasehold in the City of Chester by consent of the Legislature of Pennsylvania in accordance with the provisions of Article I, Section 8, Clause 17 of the Constitution, all laws of the State of Pennsylvania and ordinances of the City of Chester, including the Building Code Ordinance, based upon acknowledged valid police powers, must be deemed to be in effect and prohibit the Federal Works Administrator and those employed by contract with him from proceeding with the project until a permit has been secured. In support of this proposition the defendants and the City of Philadelphia rely on such authorities as The Slaughter House Cases, 16 Wall. 36, 83 U. S. 36, 62, 21 L.Ed. 394; Fort Leavenworth R. Co. v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264; Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091, and the recent decision of the Supreme Court in Penn Dairies v. Milk Control Commission, 318 U.S. 261, 63 S.Ct. 617, 87 L. Ed. 748.[13]

■ When the United States acquires lands for the purposes enumerated in Clause 17 of Section 8 of Article I by purchase with the consent of the legislature of a State the federal jurisdiction may be exclusive of state authority. Fort Leavenworth R. Co. v. Lowe, supra, 114 U.S. at page 541, 5 S.Ct. 995, 29 L.Ed. 264; United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761; Ex parte Hebard, Fed. Cas.No.6,312, 4 Dill. 380; James v. Dravo Contracting Co., 302 U.S. 134, 146, 58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318. This proposition is not open to doubt but its principle is not applicable to the circumstances of the case at bar.

■ The authority of the Administrator to proceed with the building of the

---

[12] "The Congress shall have power. * * *

"To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings; * * * ."

[13] Other subsidiary arguments are based upon Article I, Section 8, Clauses 11 to 16, inclusive, the Bill of Rights and in particular the Fifth Amendment. In the view we take of the case, however, we do not reach these subsidiary arguments and for that reason we feel they need not be discussed in this opinion.

Chester project under the Lanham Act without regard to the application of the Building Code Ordinance of Chester is to be found in the words of Clause 2 of Article VI of the Constitution of the United States which provides that the Constitution and the laws of the United States made in pursuance thereof shall be the supreme law of the land. The questions raised by the defendants were settled in general principle as long ago as the decision of Mr. Chief Justice Marshall in M'Culloch v. State of Maryland, 4 Wheat. 316, 405, 4 L.Ed. 579, wherein it was stated, "If any one proposition could command the universal assent of mankind, we might expect it would be this—that the government of the Union, though limited in its powers, is supreme within its sphere of action. This would seem to result, necessarily, from its nature. It is the government of all; its powers are delegated by all; it represents all, and acts for all. Though any one state may be willing to control its operations, no state is willing to allow others to control them. The nation, on those subjects on which it can act, must necessarily bind its component parts. But this question is not left to mere reason: the people have, in express terms, decided it by saying, 'this constitution, and the laws of the United States, which shall be made in pursuance thereof,' 'shall be the supreme law of the land,' and by requiring that the members of the state legislatures, and the officers of the executive and judicial departments of the states, shall take the oath of fidelity to it."

A state statute, a local enactment or regulation or a city ordinance, even if based on the valid police powers of a State, must yield in case of direct conflict with the exercise by the Government of the United States of any power it possesses under the Constitution. Mayo v. United States, 319 U.S. 441, 63 S.Ct. 1137, 87 L. Ed. 1504, 147 A.L.R. 761; Penn Dairies, Inc. v. Milk Control Commission, supra, 318 U.S. page 271, 63 S.Ct. 617, 87 L.Ed. 748; State of Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154;

Johnson v. Maryland, 254 U.S. 51, 41 S.Ct. 16, 65 L.Ed. 126; Jacobson v. Massachusetts, 197 U.S. 11, 25, 25 S.Ct. 358, 49 L. Ed. 643, 3 Ann.Cas. 765; Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 556, 22 S.Ct. 431, 46 L.Ed. 679. Cf. Oklahoma City v. Sanders, 10 Cir., 94 F.2d 323, 115 A.L.R. 363, and Johnson v. Morrill, 20 Cal.2d 446, 126 P.2d 873, in which state and local laws which did not hamper the construction of federal housing were held to be applicable. See also Lilly v. West Virginia, 4 Cir., 29 F.2d 61.

In view of the authorities cited, that phrase of subparagraph (b) of Section 1 of the Lanham Act which provides that the Administrator may construct houses without regard to any state or municipal laws, ordinances, rules or regulations relating to plans and specifications or forms of contract, is not pertinent to the issue of the power of Congress under the Constitution to enact such a provision. We have, we think, demonstrated the constitutionality of the power conveyed by Congress to the Administrator to proceed without regard to municipal ordinances. The words of the phrase referred to were included in the Act by Congress to convey authority to the Administrator to proceed to build emergency housing under the Act without regard to local ordinances and as precatory to the States and their municipalities to avoid if possible such situations as that demonstrated by the circumstances of the case at bar.

An argument was made by the defendants to the effect, as we apprehend it, that that phrase of Section 1 (b) authorizing the Administrator to construct buildings "(without regard to * * * any Federal, State, or municipal laws, ordinances, rules or regulations * * *)" was intended to modify only that portion of the following phrase which reads, "prior to the approval of title by the Attorney General * * *." This assertion defies not only the rules of grammar but also the intent of Congress as is demonstrated clearly by the legislative history of the Act.[14] The provisions quoted were intend-

---

14 The report of the Committee of House and Senate stated the following in respect to this portion of Section 1 (b): "[It] * * * waives the statutory prohibition against expenditure of funds on lands in the absence of an opinion of the Attorney General as to title * * *, limits of cost of the construction of barracks * * *, the 25% percent-of-rental limitation on the amount which may be expended on rented property * * *, the requirement of competitive bidding * * *, any Federal, State, or municipal laws or ordinances relating to plans and specifications or forms of contract re-

ed by Congress to facilitate speedy construction of housing units in view of the war emergency.

■ The amendment to the Lanham Act effected by Section 7 of the Act of January 21, 1942, c. 14, 56 Stat. 12, 42 U.S.C.A. § 1545, which provides, "Consultation shall be had with local public officials and local housing authorities to the end that projects constructed under the provisions of * * * [the] Act shall, as far as may be practicable, conform in location and design to local planning and tradition", is emphasized heavily by the defendants. The record contains a number of instances in which consultation was had or attempted by persons representing the Administrator with local public officials and local housing authorities.[15] The contention that local authorities were not consulted simply because nothing definite was accomplished by consultation is disingenuous. As we have indicated, it would have been difficult if not impossible to build the project in conformity with the Building Code Ordinance under the restrictions imposed upon the supplying of materials by the War Production Board. But even if no consultation had been had or none had been attempted by the Administrator with local public officials or local housing authorities, it is clear that under the circumstances it would not have been practicable to construct the project so as to "conform in location and design to local planning and tradition".

■ We should point out, however, that immunity from local building restrictions or ordinances does not imply that the Administrator is free to construct unsafe dwellings or housing which may be deleterious to the health and welfare of a community. See Title 3, Section 11 of the Act, 42 U.S.C.A. § 1548. The Federal Works Administrator has established his own code of regulations relating to building requirements consistent with safety and the public health as well as with the restrictions in costs placed upon emergency housing units by Congress and the limitations in material imposed by the War Production Board. Although the City of Philadelphia has repeatedly alleged that the dwellings to be constructed under the project would be unsafe and unsanitary and the defendants have offered some evidence to this effect, the court below made no finding which would support these allegations. We must assume therefore that the dwellings of the project would be neither unsafe nor unsanitary, but on the contrary would be fit for human habitation during the existing emergency.

■ The City of Philadelphia and National Institute of Municipal Law Officers as amici lay emphasis on Section 10 of the Act, as amended, 42 U.S.C.A. § 1547, which provides that the acquisition by the Administrator of real property shall not deprive any state or political subdivision thereof, of its criminal or civil jurisdiction in and over such property,[16] and contend that by force of this provision the Building Code Ordinance of Chester must be considered to be in force over the lands leased by the Administrator for building the project. If Section 10 be deemed to be in irreconcilable conflict with subparagraph (b) of Section 1, the latter must prevail. A specific statutory provision must be considered to be controlling over a general one unless the statute as a whole demonstrates a contrary intention, not demonstrated by the Act sub judice. Not only did Congress

quiring the approval thereof and the submission of estimates therefor. * * * " (H. Rept. No. 2923, 76th Cong., 3d sess., p. 3; S. Rept. No. 2137, 76th Cong., 3d sess., p. 2.).

[15] See Exhibit B to the bill of complaint, appendix p. 9a; the testimony of G. S. Mitchell, secretary and executive director of the Chester Housing Authority, appendix p. 29a and p. 33a; the testimony of R. H. Kline, appendix p. 51a-52a. Mr. Kline, who was a registered architect in Pennsylvania, the area planner for the United States Public Housing Authority, testified, appendix p. 53a, that he consulted with the Chester Housing Authority, the Delaware County Welfare Council, the Office of Defense, Health and Welfare Services, with the City Engineer of the City of Chester and with the Delaware County Defense Council.

[16] The section in pertinent part is as follows:

"Notwithstanding any other provision of law, the acquisition by the Administrator of any real property pursuant to [the Act] shall not deprive any State or political subdivision thereof, including any Territory or possession of the United States, of its civil and criminal jurisdiction in and over such property, or impair the civil rights under the State or local law of the inhabitants on such property. As used in this section the term 'State' shall include the District of Columbia."

expressly provide by subparagraph (b) of Section 1 that the Administrator might construct housing without regard to municipal ordinances, but, as we have stated, by Section 11 it also authorized the Administrator to make rules and regulations necessary to carry out the provisions of the Act and to "* * * establish reasonable standards of safety, convenience, and health." Such standards in fact could not be consistent in many respects with local housing laws as is demonstrated by the circumstances of the case at bar. If Congress had intended that the projects to be constructed by the Administrator under the Lanham Act should conform with local building ordinances it is to be supposed that it would have provided so expressly and would not have enacted subparagraph (b) of Section 1 which provides the contrary in words so plain as to leave no doubt as to their meaning.

It is our duty to reconcile the respective sections of the Lanham Act, if it is possible to do so. We think that the provisions of Section 10 are not irreconcilable with those of Section 1 (b) or of the Act as a whole for the following reasons. Section 10 must be deemed to refer to lands acquired by the Administrator for the purpose of the Act not only within a State but also within a territory or a possession of the United States. Insofar as lands acquired within a State are concerned, such lands might be acquired by condemnation, by purchase, by lease or otherwise·without the consent of the state legislature. The inhabitants of a federal housing project who inhabited lands so acquired would be entitled to and would retain all civil rights under the laws of the States. Such rights would include, for example, the right to vote or the right to hold office. Under the terms of Section 10 the inhabitants "on such property" would be liable for all duties and obligations imposed on them by the law of the State. They would be subject to the criminal jurisdiction of the State as well as the obligation to pay taxes imposed by it. The state government therefore would exercise civil and criminal jurisdiction over such lands in all respects save where the assertion of jurisdiction might impede or prevent the effectuation of the purpose for which the lands have been acquired by the United States. Cf. Johnson v. Morrill, 20 Cal.2d at pages 451-453, 126 P.2d at pages 877-878.

If, however, lands were acquired by the United States within a State by purchase or otherwise with the consent of a state legislature pursuant to Article 1, Section 8, Clause 17 of the Constitution, the Federal Government might exercise exclusive jurisdiction over such lands and Congress alone might legislate in regard to them and in respect to the people who inhabited them. As is stated in Surplus Trading Co. v. Cook, supra, 281 U.S. at page 652, 50 S.Ct. 456, 74 L.Ed. 1091, " 'Exclusive legislation' is consistent only with exclusive jurisdiction." On the other hand under the decision of James v. Dravo Contracting Co., supra, a State might condition its consent to the acquisition of land by the United States on the retention by the State of jurisdiction for all purposes not inconsistent with those with which the United States was acquiring the land. While it must be assumed that the terms of the consent would determine the extent of the jurisdiction retained by the State in respect to the land and that the qualification of its consent by the State would be effective under the authority last cited, may not the provisions of Section 10 of the Lanham Act have been intended by Congress to be treated as a waiver by the United States of a possible exclusive jurisdiction, or at least as precatory to the end that the United States should not exercise exclusive jurisdiction over lands acquired for housing? We think the answers to these questions should be in the affirmative. While it may be urged that it is unrealistic to assume that Congress contemplated the possibility that lands might be acquired by the Administrator with the consent of a State for emergency housing purposes which are essentially of a temporary character, we think it is possible that Congress had such a contingency in mind in enacting Section 10. Compare the facts of the present case and this conclusion with the facts and conclusions expressed in United States v. Tierney, 28 Fed.Cas. page 159, No. 16,517.

Insofar as the provisions of Section 10 relate to territories or possessions of the United States, including the District of Columbia, we think that Congress intended the local authorities to retain all civil and criminal jurisdiction save only that which would hinder the effectuation of the purpose contemplated by the Lanham Act.

The views just expressed seem confirmed by the language of Section 10. It will be observed that the section employs the phrase "Notwithstanding any other provision of law * * *." The reference seems to be to laws other than the Lanham

Act. If Congress had intended to extend the prohibition of Section 10 to the provisions of the Lanham Act, probably it would have employed some phrase such as "Notwithstanding any other provision of law or provision of this act * * * ".[17]

The judgment of the court below is affirmed.

[17] Compare the debate upon the floor of the House of Representatives in respect to the Lanham Act, Cong.Rec. 76th Cong., 3rd Sess., p. 11,865, Sept. 10, 1940, as follows: Representative Miller said, "Will they have to live up to the local zoning regulations? The bill does not state that.—Does not the gentleman believe it would be well to amend the act so the Federal Government would have to respect the local zoning restrictions and not, for instance, be allowed to erect an apartment building in an area restricted to single houses?"

Congressman Keefe replied, "I call attention to Section 10 in response to the question of the gentleman from Connecticut * * * [reading section] Would not the gentleman conclude that would be interpreted to mean that the Federal Government subjects itself to the civil jurisdiction of the community to establish zoning ordinances and such things."

Representative Allen stated, "I would say that was a proper interpretation."

The Committee Reports do not touch upon this subject. We conclude for the reasons stated in this opinion that the interpretation put upon Section 10 in the debate may not be followed.