**TRANSCONTINENTAL GAS PIPE LINE CORPORATION v. BOROUGH OF MILL-TOWN, MIDDLESEX COUNTY.**
**Civ. A. No. 500–50.**

United States District Court
D. New Jersey.

Sept. 23, 1950.

See also 93 F.Supp. 283.

288

Autenrieth & Rochester, Newark, N. J., for plaintiff, R. E. & A. D. Watson, New Brunswick, N. J., of counsel.

Hicks, Kuhlthau, Thompson & Molineux, New Brunswick, N. J., for defendant.

FORMAN, District Judge.

Plaintiff seeks an injunction to restrain defendant from interfering with or prohibiting it from constructing its 30 inch natural gas transmission pipe line through the defendant municipality.

## Findings of Fact

From the admitted allegations in the complaint, concessions of counsel at the pretrial conference and the final hearing in this case I find the following facts:

1. Plaintiff is a Delaware corporation.

2. Defendant is a municipal corporation organized under the laws of New Jersey.

3. The matter in controversy exceeds the sum of $3,000.

4. The action arises under the Constitution of the United States, Article I, Section 8, clause 3, and Amendment XIV, and the Natural Gas Act, 15 U.S.C.A. § 717 et seq.

5. Plaintiff is authorized to construct and operate a pipe line for the transmission of natural gas from points in the States of Texas and Louisiana to points in the States of Pennsylvania, New Jersey and New York under a Certificate of Public Convenience and Necessity issued by the Federal Power Commission on November 18, 1948, and is endowed with the power of eminent domain pursuant to the Natural Gas Act, as aforesaid.

6. Plaintiff is engaged in the construction of a main gas pipe line not exceeding 30 inches in diameter, approximately 1800 miles from its beginning point to its terminal points, in 14 states of the United States, and the installation is complete except for approximately 60 miles.

7. Plaintiff has entered into contracts for the transmission of natural gas to local public utility companies in Pennsylvania, New Jersey and New York, which will utilize it for redistribution, for mixing with and enriching manufactured gas or as boiler fuel for the generation of electricity and the said utility companies serve many millions of persons in their respective areas.

8. Plaintiff has obtained easements, rights of way and other authorizations from owners of land in and in the vicinity of the defendant, Borough of Milltown, for the underground installation, maintenance, operation, repair, renewal and removal of its 30 inch natural gas transmission pipe line extending in a continuous line without interruption from a point several miles south of the defendant, Borough of Milltown, through it and to a point several miles north of it. To the extent of approximately 18 miles of this course the plaintiff has obtained permission from the Public Service Electric and Gas Company of New Jersey to lay its pipe line within a 100 foot right of way owned by said company and on which is contained its high tension power lines. The said right of way crosses the defendant municipality and plaintiff proposes to traverse 3100 feet within it by exercising its right to use the said right of way except for one deviation therefrom in which it has obtained authority to lay the line from the owner, namely the estate of John Christ.

9. In so traversing the defendant municipality plaintiff will construct its installation under three street crossings— Lawrence and Highland Avenues and North Main Street.

10. Plaintiff has authority from the Board of Freeholders of Middlesex Coun-

ty in which the defendant is situate which has jurisdiction over the county highways to cross the highway known as Main Street within the defendant.

11. In January 1950 the plaintiff advised the defendant of its intention to construct its pipe line through it, specified the proposed location and requested appropriate action by the municipality to determine that the public easement in several streets it would cross would not be interfered with.

12. The request of the plaintiff was referred by defendant's Borough Council to its Planning Board which in April, 1950 reported its disapproval of the projected pipe line of the plaintiff through the defendant and recommended that plaintiff be prohibited from installing it within the corporate limits of the defendant.

13. Plaintiff renewed its request to defendant and on May 22, 1950 defendant's Borough Council adopted a resolution in which it was determined that the installation of plaintiff's pipe line would not interfere with the public easement in any streets.

14. On or about May 31, 1950 defendant's Planning Board adopted a resolution censoring the defendant's Borough Council for the adoption of the said resolution and reaffirmed its opposition to the construction and operation of plaintiff's pipe line.

15. Thereafter on May 31, 1950 defendant's mayor vetoed the resolution adopted May 22, 1950, and defendant's Borough Council rescinded the aforesaid resolution.

16. Defendant through its officers and agents has ordered plaintiff's contractors and employees to cease excavation work in progress toward crossing Highland Avenue and has prevented plaintiff's contractors and employees from installing its pipe line.

17. On June 14, 1943 the defendant adopted a Zoning Ordinance, which was amended July 26, 1943, the introduction to which is as follows:

"An Ordinance to limit and restrict to specified districts or zones and to regulate therein buildings and structures, according to their construction and the nature and extent of their use in the Borough of Milltown; establishing a Board of Adjustment; and providing penalties for the violation thereof.

"The Borough Council of the Borough of Milltown, in the County of Middlesex, and State of New Jersey, for the purpose of securing safety from fire and other dangers and of promoting the public health, morals and welfare, including so far as conditions will permit, provision for adequate light, air and convenience of access, having reasonable regard to the character of buildings already in each district designated, the value of the land and the most desirable use for which the land may be adopted, so as to conserve the value of building and enhance the value of the land throughout the Borough of Milltown; does ordain as follows: * * *."

18. Section II of said ordinance in part is as follows:

"Residence Zones

"1. Use: Within a residence district, as indicated on the Building Zone Map, no building or premises shall be used and no building or structure shall be erected or altered which is intended, arranged or designed to be used in whole, or in part, except for one or more of the following uses. * * *"

In the exceptions which follow there is no specific reference to a pipe line construction.

19. As projected the plaintiff's pipe line will be constructed 2½ feet underground in an area prescribed by the defendant as a residence zone by its said ordinance.

20. Plaintiff's pipe line has been constructed of high strength steel plate, rolled by Consolidated Western Steel Corporation of Los Angeles, California in 30 foot sections. The weld in the pipe to make it cylindrical in form is subjected to special X-ray and hydrostatic tests before it leaves the place of its fabrication under the inspection of an engineering firm specially employed by plaintiff for that purpose.

21. In the defendant municipality the pipe will be 30 inches in outside diameter with a thickness of 0.325 inches. The ex-

terior of the line will be protected with a standard coating material, a layer of glass fiber and cathodic protection to insure long life for the steel. At the actual street crossings of Highland Avenue, Lawrence Avenue and North Main Street in the defendant municipality the line will be contained in steel casing vented at both ends.

22. The design of the line calls for the installation of automatic main line valves at regular intervals so that if a break should occur the broken section may be isolated and no more gas will be permitted to enter that section until it is repaired.

23. Twenty compressor stations are constructed along the pipe line, the nearest one to the defendant being located at Downington, Pennsylvania, approximately 70 miles away. While the discharge pressure at the above mentioned compressor station will be 800 pounds per square inch the normal operating pressure in Milltown can be expected to be approximately 500 pounds.

24. On the basis of 500 pounds per square inch of pressure the operating formulas contained in the code of the American Standards Association (as sponsored and published by the American Society of Mechanical Engineers) indicate that the line passing through the defendant municipality would have a safety factor of 3.12.

25. Prior to operation it is planned that the entire line will be cleaned internally and exposed to a test pressure of 850 pounds per square inch.

26. While in operation the flow of gas in the pipe line is to be mechanically checked to very small fractions of its volume at the compression stations by despatchers in charge thereof who will be in position to detect loss of volume and act to close off portions of the line where necessary. The line will be constantly subjected to patrol, by the use of airplanes and on the ground, for leaks and for any deterioration in the material of which the line is made.

27. Field tests are made by taking specimens or coupons from the welds in the finished line and exposing them to tests as well as X-ray examination for adequacy and strength. The welder's competency is also tested by the results of the re-examinations and any defect in a weld denoting lack of ability upon the part of the welder is considered ground for the dismissal of the worker.

28. Recently the Borough Council of the defendant gave permission to the Jersey Central Power and Light Company to lay a pipe line 10 inches in diameter in which natural gas may be transmitted through a portion of its residential zone.

29. Natural gas is transmitted by way of thousands of miles of underground pipe line through many of the states of the United States including scores of municipalities.

30. The installation of plaintiff's pipe line has met the approval of the engineers of many municipalities, corporations and agencies, among them being the cities of Newark, Elizabeth, Fort Lee, Edgewater, Ridgefield, New Brunswick, Jersey City, Bayonne; the Township of North Brunswick; Middlesex County; the Public Service Electric and Gas Company, Johnson & Johnson, Central Railroad Company of New Jersey, Pennsylvania Railroad Company, West Shore Railroad Company, Erie Railroad Company, New York, Susquehanna & Western Railroad Company, Delaware, Lackawanna & Western Railroad Company, Esso Standard Oil Company, the Corps of Army Engineers, Port of New York Authority and the State Highway Department of New Jersey.

### Discussion

The plaintiff presented experts in, and independent of, its employment, who testified that the pipe line as it is proposed in the defendant municipality is similar to those of miles of high pressure gas line now in use in all parts of the United States; that the circumstance that the pipe line will be adjacent to a cross country electrical transmission system does not add a hazard to it, for many such installations throughout the country operate parallel to similar electrical transmission systems; that the insulation of 2½ feet of soil over the pipe line secures it against

danger by reason of its proximity to the electrical transmission system; that plaintiff's pipe line is being built in accordance with the most up to date practices of the engineering profession and more than meets the margin of safety factors established by the recognized standard setting authorities in the field; that it will result in a safe construction in the defendant municipality and that the likelihood of failure is extremely remote.

In defendant's answer to plaintiff's complaint in this case serious allegations[1] were made concerning the safety of the installation and operation of the proposed pipe line in the defendant municipality. At the trial the defendant attempted an intimation that accidents have occurred in which natural gas lines have ruptured with explosion and fire as results and there is no question as to the *possibility* of such danger. It is conceded that the executive officials of the defendant municipality were presented with a petition containing the names of nearly 700 citizens who protested against permitting the installation of the plaintiff's pipe line. Their apprehensions are understandable and they are entitled to have demonstrated to them whether or not there is genuine basis for their fears. To that end the court has declined summary judgment in this case so that there might be full opportunity to explore completely any foundation for the assertion of undue hazard in this facility. It is important that this should be done for if it exists the lives and property of the citizens should be appropriately safeguarded. If the apprehension is without substance they should likewise know for the situation that has been created easily lends itself to rumor mongoring and the generation of a hysterical atmosphere in which they should not be obliged to live.

The evidence before me is overwhelmingly in favor of the proposition that the pipe line as projected in the defendant municipality will be installed with all reasonable care for its safety in construction and operation. Similar installations practically span the country and the gas they carry is normally recognized as a necessity of life. They are a part of the modern mechanical age which particularly in this country has furnished man with the maximum ease in living in his history. Human carelessness, in the main, and mechanical defects, to some extent, are responsible for accidents which take their toll in human life and loss of property as witness the rate of fatalities, injuries and damages arising out of the use of automotive vehicles. But apparently our society is willing to pay this toll for the luxury of living it enjoys. Nothing in this case points to the exposure of the citizens of the defendant municipality to any hazard greater than the ordinary calculated risks which have become part of the normal conditions of life in our highly mechanized age.

Indeed, counsel for the defendant conceded with commendable candor that no expert witnesses could be produced to testify to the contrary. Therefore the apprehensions concerning the safety of the pipe line, as expressed in the defendant's answer, have failed to be supported by any proofs.

There is also a very practical economic factor basic to the desire of the plaintiff itself to provide the highest element of safety in its pipe line. One of the plaintiff's witnesses testified that the cost per foot of the line will approximate $20, while a witness of the defendant testified that based on comparative costs with which he was familiar the cost of the pipe line would be between $30 and $40 per foot.

1. "2. The construction of a 30 inch natural gas transmission pipe line immediately adjacent to the aforesaid high tension electric transmission power line would create an extreme hazard, endangering the health, safety, welfare and property of the residents and citizens of the Borough of Milltown, particularly those residing immediately adjacent to the right-of-way of the Public Service Electric & Gas Company on which the high tension electric transmission power line is constructed." Third Separate Defense to First and Second Counts, on page 3.

On the basis of the plaintiff's calculations it will have an investment of approximately $240,000,000 in the pipe line and interruption to the transmission of gas would result in an enormous money loss during even a small space of time. It is therefore obvious that it is in the interest of the plaintiff itself to construct and maintain the pipe line to a maximum degree of safety.

I am convinced, and I so find, that so far as human prediction will permit, the installation of the pipe line in the defendant municipality has been shown to be planned with the likelihood of danger to the persons and property of its citizens as being extremely remote.

But, defendant argues, aside from the question of safety it has the right to require the plaintiff to conform to its zoning ordinance. It offered testimony to show that the pipe line could be laid in five alternative routes to that which the plaintiff has chosen. Four of these would by-pass the defendant municipality entirely and one would go through a portion of it, in its residential zone.

With the question of safety resolved the issue becomes reduced to this: Is the enforcement by the defendant municipality of its zoning ordinance against the plaintiff, under the circumstances of this case, a reasonable regulation in the exercise of its police power so that it may continue to restrain the plaintiff from installing its pipe line in the projected route?

It is unquestioned that plaintiff's pipe line system is a facility of interstate commerce subject to the restrictions and controls provided by Congress in the Natural Gas Act, 15 U.S.C.A. § 717 et seq. Thatcher v. Tennessee Gas Transmission Co., 5 Cir., 180 F.2d 644; Williams v. Transcontinental Gas Pipe Line Corp., D.C., 89 F.Supp. 485.

The Natural Gas Act contemplates that a holder of a certificate of public convenience and necessity will acquire the necessary right-of-way to construct and maintain its pipe line by negotiation, or in case of failure thereof, it may acquire the same by the exercise of the right of eminent domain.[2]

Granted a valid purpose to be furthered by condemnation, the determination by the condemnor of the necessity to take certain property to carry out the public purpose, is conclusive, and cannot be examined by courts which will not disturb the exercise of such discretion with respect to particular route, line or location selected in the absence of fraud, bad faith or gross abuse of such discretion. Williams v. Transcontinental Gas Pipe Line Corp., supra, 89 F.Supp. at page 489; Martin v. Portland Pipe Line Co., 1 Cir., 158 F.2d 848. It has long been the law that an objection based merely on the ground that some other location might have been chosen or that other available property is suitable for the purpose will not be sustained. Oregon-Washington R. & N. Co. v. Wilkinson, 9 Cir., 188 F. 363; Colorado E. Ry. Co. v. Union Pacific Ry. Co., C.C., 41 F. 293, 299; 18 American Jurisprudence, 735, Eminent Domain, Section 108.

The general rule that those clothed with the power of eminent domain are allowed considerable discretion and latitude with respect to details is applicable to non-governmental organizations. This is obvious from the many cases involving railroad and pipe line companies, some of which have been cited.

It must follow that a public utility, authorized by law to acquire a right-of-

---

2. "When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. * * *" 15 U.S.C.A. § 717f(h).

way by eminent domain whenever necessary, has an equivalent scope of discretion in its selection of a route where it is able to acquire the same by negotiation.

While Congress has brought the natural gas field largely within the orbit of its control it has left to the states some power of regulation with respect thereto.[3] However, the regulatory powers of Congress over the transportation of natural gas in interstate commerce clearly encompass some control over the location and route of pipe line systems. The requirements of obtaining a Certificate of Public Convenience and Necessity and the delegation of the power of eminent domain lend emphasis to this proposition. See Illinois Nat. Gas Co. v. Central Ill. Pub. Serv. Co., 314 U.S. 498, 62 S.Ct. 384, 86 L.Ed. 371. Nevertheless we shall assume arguendo in the absence of specific prohibitory language in the Natural Gas Act that Congress did not intend to immunize the construction of a pipe line system against all state regulation whatsoever.[4]

The issue then resolves itself to a determination of the extent to which this plaintiff in the acquisition of rights-of-way for its interstate pipe line is subject to local regulation by the defendant municipality in the selection of a particular route for such pipe line.

The impact of the police power of a state or its subdivisions upon the constitutional grant to Congress of the right to regulate interstate commerce has been considered by the Supreme Court on many occasions. In the case of Southern Pacific Ry. Co. v. State of Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915, Chief Justice Stone made the following observations:

"Although the commerce clause conferred on the national government power to regulate commerce, its possession of the

power does not exclude all state power of regulation. Ever since Willson v. Black-Bird Creek Marsh Co., 2 Pet. 245, 7 L.Ed. 412, and Cooley v. Board of Wardens, 12 How. 299, 13 L.Ed. 996, it has been recognized that, in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it. * * *" 325 U.S. at pages 766–767, 65 S.Ct. at page 1519.

"The principle that, without controlling Congressional action, a state may not regulate interstate commerce so as substantially to affect its flow or deprive it of needed uniformity in its regulation is not to be avoided by 'simply invoking the convenient apologetics of the police power,' Kansas City Southern R. Co. v. Kaw Valley District, supra, 233 U.S. [75] 79, 34 S.Ct. [564] 565, 58 L.Ed. 857; Buck v. Kuykendall, 267 U.S. 307, 315, 45 S.Ct. 324, 325, 69 L.Ed. 623, 38 A.L.R. 286. In the Kaw Valley case the Court held that the state was without constitutional power to order a railroad to remove a railroad bridge over which its interstate trains passed, as a means of preventing floods in the district and of improving its drainage, because it was 'not pretended that local welfare needs the removal of the defendants' bridges at the expense of the dominant requirements of commerce with other states, but merely that it would be helped by raising them.' And in Seaboard Air Line R. Co. v. Blackwell, 244 U.S. 310, 37 S.Ct. 640, 61 L.Ed. 1160, L.R.A. 1917F, 1184, it was held that the interference with interstate rail transportation resulting from a state statute requiring as a safety measure that trains come almost to a stop at grade crossings, outweigh the lo-

3. 15 U.S.C. § 717; Federal Power Comm. v. Panhandle Eastern Pipe Line Co., 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499; Panhandle Eastern Pipe Line Co. v. Pub. Serv. Comm. of Indiana, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128.

4. It may be that Congress under the supremacy clause and its powers over interstate commerce could have explicitly provided that this pipe line should be con-

structed and the route determined without regard to any state or municipal law for it is recognized that a state statute, a local enactment or regulation, even if based on the valid police powers of a state, must yield in case of direct conflict with the exercise by the federal government of any power it possesses under the Constitution. See U. S. v. City of Chester, 3 Cir., 144 F.2d 415, 420 and cases cited therein.

cal interest in safety, when it appeared that compliance increased the scheduled running time more than six hours in a distance of one hundred and twenty-three miles. * * *" 325 U.S. at pages 779–780, 65 S. Ct. at page 1525.

"More recently in Kelly v. State of Washington, 302 U.S. 1, 15, 58 S.Ct. 87, 94, 82 L.Ed. 3, we have pointed out that when a state goes beyond safety measures which are permissible because only local in their effect upon interstate commerce, and 'attempts to impose particular standards as to structure, design, equipment, and operation [of vessels plying interstate], which in the judgment of its authorities may be desirable, but pass beyond what is plainly essential to safety and seaworthiness, the state will encounter the principle that such requirements, if imposed at all, must be through the action of Congress which can establish a uniform rule. Whether the state in a particular matter goes too far must be left to be determined when the precise question arises.'" 325 U.S. at page 781, 65 S.Ct. at page 1526.

With more particular reference to state regulations of natural gas the following judicial utterances may be noted:

"Natural gas is a lawful article of commerce, and its transmission from one state to another for sale and consumption in the latter is interstate commerce. A state law, whether of the state where the gas is produced or that where it is to be sold, which by its necessary operation prevents, obstructs or burdens such transmission is a regulation of interstate commerce—a prohibited interference. * * *" Commonwealth of Pennsylvania v. State of West Virginia, 262 U.S. 553, at pages 596–597, 43 S.Ct. 658, 665, 67 L.Ed. 1117, 32 A.L.R. 300.

"Interstate commerce in natural gas including therein its transportation among the states by pipe line is a subject national in its character and susceptible of regulation by uniform rules. The silence or inaction of Congress relative to such a subject is a conclusive indication that it intends that interstate commerce therein shall be free, and any law or act of a state or

of its officers which prohibits it or substantially restrains its freedom is violative of the Constitution and void. * * *

"No state may by means of its police power, or its proprietary power, over highways or by means of any of its other powers, erect and maintain impassable barriers against interstate commerce along its borders or through its body in the face of the grant to the nation of the power to regulate that commerce; for all the powers of the state are subordinate to this power of the nation and to its will that such commerce shall be free. * * *" Haskell v. Cowham, 8 Cir., 187 F. 403, at page 408.

"The police power of a state, while not susceptible of definition with circumstantial precision, must be exercised within a limited ambit and is subordinate to constitutional limitations. It springs from the obligation of the state to protect its citizens and provide for the safety and good order of society. Under it there is no unrestricted authority to accomplish whatever the public may presently desire. It is the governmental power of self-protection and permits reasonable regulation of rights and property in particulars essential to the preservation of the community from injury. * * *" Panhandle Eastern Pipe Line Co. v. State Highway Comm. of Kansas, 294 U.S. 613, at page 622, 55 S.Ct. 563, 567, 79 L.Ed. 1090.

It is clear therefore that defendant municipality's zoning ordinance promulgated under the police power of the state can be sustained only if it is reasonable and justifiable and does not create an undue burden on interstate commerce. An examination of the ordinance itself leaves doubt as to whether or not it contemplated any regulation of underground pipe lines but putting this technicality aside what justification can there be to warrant the enforcement of the ordinance against the plaintiff as attempted in this case? The question of safety is no longer here. Since the installation is 2½ feet underground it cannot be characterized as an inconvenience, or even an affront to the aesthetic sense, particularly in view of the fact that it proposes to follow in the course where already the

metal towers of the Public Service Electric and Gas Company rear themselves to bear their overhanging high tension power lines. Any basis for such suggestion is further dissipated by the fact that the defendant recently granted permission to the Jersey Central Power and Light Company to install a pipe line through its residential zone albeit one smaller in diameter.

The defendant stands only upon the suggestion of its mayor that other routes are available, which is corroborated by another witness. Neither is qualified to testify as to the engineering feasibility of the transportation of natural gas with relation to the installation of the pipe line or the maintenance and operation thereof. The only efficacy of this testimony rests in the statements that the pipe line could be otherwise routed. This is almost axiomatic for as one of the defendant's witnesses on cross examination admitted a pipe line can be laid practically anywhere, including the side of the Empire State Building if expense is of no consideration.

On the other hand the plaintiff has shown logical, efficient and economical reasons for following the right-of-way of the Public Service Electric and Gas Company in this particular congested industrial portion of this state. By doing so it insures a minimum of inconvenience to, and destruction of property of, others.

In a somewhat similar situation dealing with the condemnation of land for pipe line purposes the court in the case of Williams v. Transcontinental Pipe Line Corp., supra, stated:

"The claim is merely that, in the exercise of its rights, the defendant should have run its line across the property of some one else, or crossed petitioners' property at a different place.

"It is obvious that such a contention must fail. If a landowner, merely by showing that it would be possible for a utility line

or highway to avoid crossing his property, could compel the condemnor to relocate its line, no power line, railroad, pipe line, or highway could ever be located properly to serve the public. The determination of what property is needed to accomplish the public purpose for which the right of eminent domain is given must of necessity rest primarily with the agency charged with carrying out the public work. There may be cases where the condemnor so abuses its discretion or acts in such bad faith in locating its line that the court would be justified in intervening; but usually no Judge would take upon himself the burden of deciding the best location for a utility line." 89 F.Supp. 488–489.

This reasoning is equally applicable to this plaintiff, although it was not necessary for it to exercise its right of eminent domain in the instance under question here. The fact remains that the mere claim by defendant that its ordinance requires plaintiff to locate its pipe line in an alternative route, suggested as available, does not fortify it with power to impede the plaintiff in the prosecution of its legal objective in the field of interstate commerce.[5] Such an attempt to obstruct interstate commerce under guise of an assertion of exercise of the police power must fail.

Hence I find as

## Conclusions of Law

1. That the restraint imposed by the defendant under its zoning ordinance upon plaintiff under the circumstances of this case preventing it from proceeding to install its pipe line as projected within the defendant municipality is unreasonable, arbitrary and without foundation or justification in the health, safety and welfare of the citizens of the defendant and it follows that such interference by defendant constitutes an undue burden upon interstate commerce, and

5. Cf. Long Island Lighting Co. v. Village of Old Brookville, Sup., 72 N.Y.S.2d 718, affirmed 298 N.Y. 569, 81 N.E.2d 104, wherein the court held that the village had no right by its zoning ordinance to prohibit maintenance of power lines with-in it by a lighting company which was vested with powers and rights granted to electric corporations by the Transportation Corporations Law, McK.Consol. Laws, c. 63.

2. That plaintiff is entitled to an injunction restraining defendant, its officers and agents, from preventing or interfering with the construction by plaintiff of its 30 inch natural gas transmission pipe line in and through the defendant municipality.

An order conforming with these findings should be submitted.