# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-2366

_____

United States of America,    *
                             *
          Appellee,          *
                             *    Appeal from the United States
     v.                      *    District Court for the
                             *    District of Minnesota.
City of St. Paul,            *
                             *
          Appellant.         *         To Be Published

_____

Submitted:  February 12, 2001
Filed:  August 2, 2001

_____

Before RICHARD S. ARNOLD, HANSEN, Circuit Judges, and KORNMANN,[1]
    District Judge.

_____

KORNMANN, District Judge.

Congress has affirmed as a national goal "a decent home and a suitable living environment for every American Family."  12 U.S.C. § 1701t.  The United States Department of Housing and Urban Development ("HUD") insures certain mortgages on single family homes (12 U.S.C. § 1709) to encourage private entities to lend money to home buyers who would otherwise not qualify for a conventional loan and mortgage. In furtherance of that goal, HUD is obligated to ensure maximum returns to the Single

_____

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota, sitting by designation.

Family Mortgage Insurance Fund (" Fund") as created by the National Housing Act, 12 U.S.C. §§ 1701-1750g. The object is to protect assets of the federal government.

HUD insured just such a mortgage on a home in St. Paul, Minnesota. The mortgagor defaulted and abandoned the house. The City of St. Paul ("St. Paul") learned of the vacant house, conducted an inspection in August of 1998, and found various St. Paul code violations. The mortgagee foreclosed, obtained a judgment of foreclosure, submitted a claim to HUD to cover the defaults of the mortgagor, and, in late April of 1999, deeded the house to HUD. HUD immediately acted to inspect the house, cap the natural gas line, disconnect the electricity, lock all windows and doors, and mow the grass. HUD acted later to remove snow from the sidewalk and driveway. HUD developed a marketing plan to sell the house and caused the house to be appraised. HUD policies are to attempt to sell acquired houses as quickly as possible at affordable prices to owner occupants. *See* 56 Fed. Reg. 13,996 (April 4, 1991). HUD followed these policies in this case.

St. Paul again inspected the house on July 22, 1999, and, in early August, sent HUD an order for HUD to abate the claimed nuisance building. St. Paul relied on its nuisance abatement code. St. Paul posted on the house a written notice to advise of the demands being made, advise of certain deadlines, and advise that the house was in a "nuisance condition." St. Paul conducted another inspection and notified HUD on August 26 of required repairs costing up to $40,000. St. Paul ordered HUD to either make the repairs or obtain a St. Paul building permit to do so and post a $2,000 bond, setting a deadline of September 7, 1999. HUD was directed to, among other things, replace all floor coverings, including carpet, completely rebuild the garage, install new storms and screens for all windows and doors, repaint the exterior and interior of the house, and rewire the basement with switches and outlets. HUD was told that, if it failed to comply, the house would be demolished.

St. Paul next served HUD with notice of a hearing. A St. Paul official conducted such hearing on October 19. HUD did not appear. On October 27, HUD obtained a buyer for cash ($25,009.00) who intended to make repairs and then occupy the property as his principal residence. The St. Paul City Council conducted a hearing on October 27. A marketing contractor for HUD appeared, telling St. Paul about the acceptance of the offer and the fact that the buyer would be required to make all repairs previously required by St. Paul. The city council nevertheless set a deadline of November 15 for HUD to avoid demolition, the expenses of which would be charged to HUD. HUD requested in writing that St. Paul reconsider and not proceed with demolition. The proposed purchaser also contacted the mayor's office, seeking to prevent demolition. Reconsideration was denied. On December 6, St. Paul told HUD it was proceeding with demolition.

On February 3, 2000, the United States instituted this declaratory judgment action against St. Paul. On February 8, St. Paul's demolition contractor obtained a city permit to demolish. On February 14, the United States obtained a temporary restraining order. The parties filed cross motions for summary judgment. The district court[2] granted summary judgment and entered a permanent injunction against St. Paul. The district court held that the St. Paul ordinance conflicts with the goals of the National Housing Act, conflicts with the HUD policy of "as is" dispositions of acquired property which policy is designed to avoid needlessly spending federal funds, and conflicts with the authority and discretion of HUD in the disposition of property.

On May 27, 2000, HUD finally closed the sale to the buyer who had been obtained earlier and who had his funds in escrow for seven months. The buyer was indeed required by HUD to comply with the St. Paul ordinance, despite the fact that the costs to renovate had increased.

---

[2]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

The injunction prohibits St. Paul from ordering HUD in the future to abate any alleged nuisance conditions as to property acquired by HUD, from ordering the demolition of HUD property, and from taking any other action inconsistent with the authority conferred upon HUD by the federal statutes and regulations, including any mandatory St. Paul inspections that would interfere with the use or disposition of HUD property.

The League of Minnesota Cities, the City of Minneapolis, and the International Municipal Lawyers Association have all filed *amicus curiae* briefs supporting the arguments of St. Paul.

The question we decide is whether St. Paul's nuisance abatement code impermissibly interferes with the operation of the National Housing Act. "It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation. *EPA v. State Water Resources Control Board,* 426 U.S. 200, 211 (1976); accord, *Hancock v. Train*, 426 U.S. 167, 178-179 (1976); *Mayo v. United States*, 319 U.S. 441, 445 (1943)." Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 180 (1988). The general rule established in McCulloch v. Maryland, 4 Wheat. 316, 436, 4 L.Ed. 579 (1819), is that "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." We must be cautious as we apply this language.

The Secretary of HUD is authorized "to deal with, complete, rent, renovate, modernize, insure, or sell for cash or credit, in his discretion" any properties conveyed to the Secretary. 12 U.S.C. § 1710(g). HUD regulations have, since October 16, 1991, provided that homes acquired "will be offered for sale in 'as-is' condition . . ." 24 C.F.R. §291.100(c)(1), (2) and (3). Prior to the mid-1970's, the HUD practice was to make extensive repairs to acquired houses prior to marketing them. In Burroughs v.

Hills, 741 F.2d 1525 (7th Cir. 1984), facts are set forth to show that HUD had determined that a house in Chicago had a fair market value of $40,000.00 and needed repairs of $17,389.00. During the 18 months HUD owned the house it was unoccupied and subject to frequent acts of vandalism. HUD finally sold the house to the city of Chicago for $1.00 on July 19, 1976. Perhaps due in part to this experience and many other similar experiences, the HUD practice of making extensive repairs was abandoned; the costs of repairs when paid by the federal government (from the Fund) were much higher than private parties faced. Many buyers desire to supply "sweat equity", i.e. make their own repairs. In many cases where HUD had made expensive repairs, the houses were still subject to vandalism. HUD also wished to avoid the great expense of carefully monitoring the repair process in an attempt to prevent waste and fraud. At any given time, HUD has tens of thousands of similar homes in "inventory" throughout the country. In short, HUD determined that its previous practice of substantially repairing homes was a failure. In addition, the costs to buyers from HUD became prohibitively high, frustrating the purpose of the Act. A HUD handbook tells us that the "as-is" sales approach is the preferred disposition technique, stating, however, that a property "may be programmed for repairs when . . . the property needs repair to comply with actively enforced local codes or unrepaired sales are prohibited by such codes or local ordinance." This handbook, although not adopted by administrative rule subject to notice and comment, is entitled to notice as the agency's interpretation of its own regulations and should be accepted by us unless there is a showing that the handbook is unreasonable or inconsistent with statutory authority. Fairfax Nursing Center, Inc. v. Califano, 590 F.2d 1297, 1301 (4th Cir. 1979). The HUD handbook states that "properties are to be sold on an 'as-is' basis, without repairs or warranties." Property Disposition Handbook, Directive No. 4310.5, § 6-19m; www.hudclips.org. The handbook further instructs that a field office "may undertake limited repairs prior to selling certain properties. Repairs should be limited to minimum essential items to comply with HUD mortgage insurance criteria, or otherwise comply with actively enforced local codes. This technique should not be used routinely and only on an exception basis." These various provisions, while written in sometimes

contradictory phrases, are nevertheless sufficiently clear that it is HUD and not a municipality or other local unit of government who is to make these decisions. In 1998, the National Housing Act was amended, granting HUD even greater authority. "The Secretary may sell real . . . property acquired by the Secretary . . . on such terms and conditions as the Secretary may prescribe." Pub.L. 105-276, Title VI, §601(d), 112 Stat. 2670 (1998) (codified at 12 U.S.C. § 1710(g)).

The parties cite to 42 U.S.C. § 3535(i)(1) with varying interpretations. The subsection authorizes the Secretary of HUD to

> foreclose on any property or commence any action to protect or enforce any right conferred . . . by any law, contract or other agreement, and bid for and purchase at any foreclosure or any other sale any property in connection with which [the Secretary] has made a loan or grant. In the event of any such acquisition, the Secretary may, notwithstanding any other provision of law relating to the acquisition, handling, or disposal of real property by the United States, complete, administer, remodel and convert, dispose of, lease, and otherwise deal with such property; *Provided*, That any such acquisition of real property shall not deprive any State or political subdivision thereof of its civil or criminal jurisdiction in and over such property or impair the civil rights under the State or local laws of the inhabitants on such property . . .

St. Paul argues that the subsection provides clear and unambiguous authorization for St. Paul to apply its nuisance abatement ordinance to HUD. We reject this argument. We first note that the statute applies only when HUD has purchased property by means of a "foreclosure or any other sale" in cases where HUD has made a loan. HUD made no loan and did not purchase this house at a foreclosure or other sale. In addition, we agree with the rationale of United States v. Chester, 144 F.2d 415 (3rd Cir. 1944), where a nearly identical statute, the then existing version of 42 U.S.C. § 1547, was interpreted. The purpose of the statute was to make clear that certain federal property as acquired was not to be considered a "federal enclave" so as to

deprive the host state of all civil and criminal jurisdiction. There is no claim in the present case that this HUD acquired house was ever a federal enclave. As expressed in Chester, the statutory language is not to be utilized to "impede or prevent the effectuation of the purpose for which" the house was acquired by HUD. *Id.* at 421-422.

We agree also with the rationale of Oklahoma City v. Sanders, 94 F.2d 323 (10th Cir. 1938). HUD must be able to carry out its federal functions in a relatively uniform fashion. HUD cannot be subjected to a vast multitude of municipal ordinances throughout the United States which ordinances require the federal government to spend federal funds, post bonds, and obtain a local building permit, with HUD suffering the prospect of destruction of federal property for failure to comply with local ordinances. The St. Paul ordinance as applied to HUD retards, impedes, burdens and interferes with the operations of a constitutional federal law, the National Housing Act. The impact of the St. Paul ordinance is not simply incidental. It is intrusive as to HUD.

We reject the contention that the injunction is overly broad and we affirm the district court.

A true Copy.

Attest:

Clerk, U.S. Court of Appeals, Eighth Circuit.